******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# STATE OF CONNECTICUT *v.* DIVENSON PETION
## (SC 19938)

Robinson, C. J., and Palmer, McDonald, D'Auria,
Mullins, Kahn and Ecker, Js.

*Syllabus*

Pursuant to statute (§ 53a-59 [a] [1]), a person is guilty of assault in the first degree when, with intent to cause serious physical injury to another person, he causes such injury to such person or to a third person by means of a deadly weapon or a dangerous instrument.

Pursuant further to statute (§ 53a-3 [4]), "serious physical injury" means physical injury that, inter alia, causes serious disfigurement.

Convicted of two counts of the crime of assault in the first degree in connection with a knife attack on two victims, B and R, the defendant appealed to the Appellate Court, claiming, inter alia, that there was insufficient evidence to support a conviction of first degree assault as to B because the state failed to demonstrate that she suffered a serious physical injury in the form of serious disfigurement. The defendant had attacked R during a dispute, and B, in an attempt to stop the defendant from injuring R, inserted herself between the two men. In the process, the defendant cut B's arm. At trial, the state introduced testimony from B's treating physician and two sets of photographs, one set taken shortly after medical treatment had been rendered and one set taken thirty months later, at the time of trial. Each set included one photograph magnifying B's injuries at close range and one photograph in which B displayed the injured area of her arm from a sufficient distance to capture the area from her torso to her head. The evidence established that B had a 1.38 inch abrasion and a 0.30 inch laceration just above her left elbow, and a 1.57 inch laceration just below her left elbow on her forearm. The smaller laceration was closed with a single suture, whereas the larger laceration required ten sutures. At the time of trial, the larger laceration had left a scar approximately the same length as that laceration and was a slightly lighter tone than the surrounding skin. No other injury was apparent, and B's treating physician testified that the scar would remain in its present condition. The Appellate Court affirmed the judgment of conviction, and the defendant, on the granting of certification, appealed to this court. *Held*:

1. The state failed to prove beyond a reasonable doubt that the defendant had committed assault in the first degree by inflicting serious physical injury on B with a dangerous instrument, the evidence having failed to establish that B suffered serious disfigurement as a result of the defendant's assault, and, accordingly, the Appellate Court's judgment was reversed insofar as that court upheld the defendant's conviction of assault in the first degree as to B, and the case was remanded with direction to vacate the defendant's sentence and for resentencing on the remaining count: although the defendant's claim ordinarily is a factual question for the jury, this court determined that there was a legal distinction between physical injury and serious physical injury that was not a purely subjective matter, and, having determined that there was no definition in the Penal Code of the foundational term, disfigurement, this court looked to extratextual sources, including dictionary definitions, Connecticut's workers' compensation scheme, and to definitions and factors identified by other jurisdictions, to conclude that serious disfigurement is an impairment of or injury to the beauty, symmetry or appearance of a person of a magnitude that substantially detracts from the person's appearance from the perspective of an objective observer; moreover, the determination of whether a physical injury caused serious disfigurement shall include consideration of such factors as the duration of the disfigurement, its location, its size, and its overall appearance, as well as the fact that serious disfigurement need not be permanent or in a location of the body that is readily visible to others; applying that definition and the relevant factors to B's injuries, this court concluded that the evidence established that, although B sustained a disfigurement, in the form of a permanent scar, that disfigurement was not

of a magnitude that objectively could be found to substantially detract from B's appearance, as B's scar was not in a prominent location, and was relatively small in size, uniform in shape and otherwise unremarkable in its appearance.

2. The state could not prevail on its claim that, in light of this court's determination that the evidence was insufficient to sustain the defendant's conviction of first degree assault as to B, it should not direct a judgment of acquittal on that charge but, instead, should direct that the judgment be modified to reflect the defendant's conviction of the lesser included offense of assault in the second degree, the highest lesser included offense that requires proof of physical injury rather than serious physical injury: the state conceded that, in accordance with recent precedent, *State* v. *LaFleur* (307 Conn. 115), this court must direct a judgment of acquittal on the defendant's conviction of first degree assault as to B, when the evidence is insufficient to sustain that conviction and the jury was not instructed on a lesser included offense, and the state failed to provide sufficient justification for overruling *LaFleur* in favor of a rule pursuant to which a conviction suffering from evidentiary insufficiency would be modified to the highest lesser included offense supported by the evidence, unless the defendant can prove that the absence of a jury instruction on the lesser included offense was prejudicial; moreover, there was no indication that the rule in *LaFleur* is unworkable, as the state always can request an instruction on a lesser included offense that is supported by the evidence, and, as both parties were aware at trial that *LaFleur* was the controlling law, it would be unfair to the defendant to change the law on appeal because, had the defendant known that the judgment would be modified if he succeeded in challenging his conviction on the ground of evidentiary insufficiency, he might have sought an instruction not only on assault in the second degree but also on other lesser offenses supported by the evidence.

(*One justice concurring separately*; *three justices dissenting in one opinion*)

Argued November 13, 2018—officially released July 23, 2019

*Procedural History*

Substitute information charging the defendant with two counts of the crime of assault in the first degree, brought to the Superior Court in the judicial district of Stamford-Norwalk and tried to the jury before *White, J.*; verdict and judgment of guilty, from which the defendant appealed to the Appellate Court, *DiPentima, C. J., and Prescott and Beach, Js.*, which affirmed the trial court's judgment, and the defendant, on the granting of certification, appealed to this court. *Reversed in part; judgment directed in part; further proceedings.*

*Jennifer B. Smith*, assigned counsel, for the appellant (defendant).

*James M. Ralls*, assistant state's attorney, with whom were *Richard J. Colangelo, Jr.*, state's attorney, and *Maureen Ornousky*, senior assistant state's attorney, for the appellee (state).

*Opinion*

McDONALD, J. Whether an assault results in physical injury or *serious* physical injury can have profound ramifications for the victim. Consequently, substantially greater punishment may be imposed for the latter injury than the former.[1] Although this court has acknowledged "the difficulty of drawing a precise line as to where physical injury leaves off and serious physical injury begins" (internal quotation marks omitted); *State* v. *Ovechka*, 292 Conn. 533, 546–47, 975 A.2d 1 (2009); see also *State* v. *Almeda*, 211 Conn. 441, 451, 560 A.2d 389 (1989); the present case provides an opportunity to illuminate that distinction. In particular, we use this occasion to examine the parameters that should be used by the trier of fact to assess whether a defendant has inflicted serious physical injury in the form of serious disfigurement. See General Statutes § 53a-3 (4).

The defendant, Divenson Petion, appeals from the Appellate Court's judgment affirming his conviction of two counts of assault in the first degree in violation of General Statutes § 53a-59 (a) (1).[2] See *State* v. *Petion*, 172 Conn. App. 668, 669–70, 687, 161 A.3d 618 (2017). The defendant claims that the forearm scar sustained by one of the two victims was an insufficient basis for the jury to find the serious physical injury necessary to support that charge. The state disagrees but requests, in the event that we conclude otherwise, that a judgment of acquittal not be rendered on that charge and, instead, that the judgment be modified to reflect a conviction of the lesser included offense of assault in the second degree; see General Statutes § 53a-60 (a) (2); and the case be remanded for resentencing. We conclude that the evidence was insufficient to support the challenged conviction. We further conclude that, under *State* v. *LaFleur*, 307 Conn. 115, 51 A.3d 1048 (2012), the state is not entitled to have the defendant's conviction modified. Therefore, we reverse in part the Appellate Court's judgment.

I

The Appellate Court's opinion sets forth the facts that the jury reasonably could have found; see *State* v. *Petion*, supra, 172 Conn. App. 670–72; which we summarize as follows. In 2008, the defendant began dating Rosa Bran. Bran gave birth to the defendant's daughter in February, 2010. Bran also had a son from a prior relationship. After the birth of his daughter, the defendant's romantic relationship with Bran ended. However, they remained in contact, and the defendant occasionally would visit his daughter, sometimes showing up unannounced. The defendant told Bran that he did not want other men around his daughter.

Shortly before the May, 2012 incident giving rise to the criminal charges at issue, Bran resumed a friendship with a former boyfriend, Robert Raphael. On the day

of the incident, Bran invited Raphael to her apartment, and he arrived in the early afternoon. In addition to Bran and her two children, her cousin's two children were present. Later that afternoon, there was a knock on the door. Bran answered the door, expecting that it was her cousin arriving to pick up her children, but it was the defendant. He asked to see his daughter. Bran explained that it was not a good time because the child was asleep.

The defendant then saw Raphael. The defendant became angry, pushed Bran aside, and entered the apartment. He began to shout at Raphael to get out of the apartment. Raphael did not want to leave Bran and the children alone with the defendant in his agitated state, and told the defendant that he was staying. In response, the defendant began pushing and punching Raphael. As Raphael retreated further into the apartment, the defendant pursued him. The defendant pulled out a knife from his pocket and slashed Raphael across the face, cutting from Raphael's ear to along his jaw bone, deeply enough to damage a facial nerve and cut a branch of his jugular vein. Bran inserted herself between the two men during the confrontation, hoping to stop the defendant from injuring Raphael. In the process, the defendant cut Bran on her left arm. Raphael, who was bleeding profusely, ran out of the apartment, got in his car, and drove himself to the hospital.[3]

The defendant repeatedly apologized to Bran and then left the apartment. Bran was not immediately aware that she had been cut. She realized that she had been injured when her son came downstairs, alerted Bran that she was bleeding, and grabbed a towel to cover her wound. Shortly after the incident, Bran's cousin arrived to pick up her children, and she drove Bran to the hospital.

When she arrived at the hospital, Bran had an abrasion and two lacerations on her left arm, one measuring three-quarters of one centimeter and another measuring four centimeters.[4] The smaller laceration was treated with a single suture. The larger laceration was closed with ten sutures, which left a scar after the laceration healed.

The record reveals the following additional facts. The state charged the defendant with two counts of assault in the first degree in violation of § 53a-59 (a) (1). The first count alleged that, with the intent to cause serious physical injury to Raphael, the defendant caused such injury to Raphael by means of a dangerous instrument. The second count alleged that, with the intent to cause serious physical injury to Raphael, the defendant caused such injury to Bran by means of a dangerous instrument.

At trial, the defendant presented an alibi witness, a

family friend. At the close of evidence, the defendant moved for a judgment of acquittal on the charge of first degree assault as to Bran. The court denied the motion. Neither the defendant nor the state elected to have the jury charged on any lesser included offense. The jury returned a guilty verdict on both counts. On each count, the trial court imposed a seventeen year term of imprisonment, followed by three years of special parole, to run concurrently.

The defendant appealed from the judgment of conviction to the Appellate Court. He argued, in relevant part, that there was insufficient evidence to support a conviction of first degree assault as to Bran because the state had failed to demonstrate beyond a reasonable doubt that she suffered a " 'serious physical injury.' "[5] Id., 669. The Appellate Court agreed with the state "that the evidence presented to the jury showed that one of the two lacerations that Bran received resulted in a significant and readily visible scar and that, under our law, a jury reasonably could have found that such scarring constituted a serious disfigurement and, therefore, a serious physical injury." Id., 673. The Appellate Court affirmed the judgment of conviction. Id., 687.

We thereafter granted the defendant's petition for certification to appeal, limited to the following issue: "In rejecting the defendant's claim that there was insufficient evidence to support his conviction of assault in the first degree in violation of . . . § 53a-59 (a) (1) with respect to . . . Bran, did the Appellate Court properly conclude that a jury reasonably could have found that the one and one-half inch scar on her forearm constituted serious disfigurement and, therefore, a serious physical injury?" *State* v. *Petion*, 326 Conn. 906, 163 A.3d 1205 (2017).

In their responses to this question, the parties devote significant portions of their analyses to a comparison between those injuries that the Appellate Court has deemed sufficient to support a jury's finding of serious disfigurement in other cases and Bran's injury in the present case. Although they disagree as to which side of the line the present case falls, they agree that juries would be aided in making this determination by factors to guide them.[6]

We do not find the comparative approach taken by the parties to be useful here, particularly because the Appellate Court had not examined the meaning of "serious disfigurement" in any of these cases,[7] and this court previously had given no guidance on the matter. Thus, before we can consider the evidence, we must ascertain the meaning of the legal standard against which we assess that evidence. See *State* v. *Drupals*, 306 Conn. 149, 159, 49 A.3d 962 (2012). The statutory text is our lodestar in this endeavor, and we consider relevant extratextual sources to illuminate any ambiguity therein to ascertain legislative intent. See General Statutes § 1-

2z. Insofar as any ambiguity exists, "[i]t is a fundamental tenet of our law to resolve doubts in the enforcement of a [P]enal [C]ode against the imposition of a harsher punishment." (Internal quotation marks omitted.) *State* v. *Drupals*, supra, 160.

The defendant was convicted of violating § 53a-59 (a) (1), which provides in relevant part: "A person is guilty of assault in the first degree when . . . [w]ith intent to cause serious physical injury to another person, he causes such injury to such person or to a third person by means of . . . a dangerous instrument . . . ."[8] The Penal Code in turn defines certain essential terms. " 'Physical injury' means impairment of physical condition or pain . . . ." General Statutes § 53a-3 (3). " 'Serious physical injury' means physical injury which creates a substantial risk of death, or which causes serious disfigurement, serious impairment of health or serious loss or impairment of the function of any bodily organ . . . ." General Statutes § 53a-3 (4).

These definitions plainly reflect a legislative intention to establish a material degree of difference between mere physical injury and *serious* physical injury. This differentiation is reflected in the severity of punishment attendant to each. Assault resulting in physical injury, unless inflicted by discharge of a firearm, carries a maximum term of imprisonment of five years, whereas assault resulting in serious physical injury carries a maximum term of imprisonment of twenty years. See General Statutes §§ 53a-35a (6) and (7), 53a-59 (b) and 53a-60 (b). Thus, "[a]lthough it may often be difficult to distinguish between the two, such a distinction *must* be drawn; a person can be found guilty of assault in the first degree under . . . § 53a-59 [a] [1] only if he 'causes *serious* physical injury to another person.' " (Emphasis in original.) *State* v. *Rossier*, 175 Conn. 204, 207, 397 A.2d 110 (1978).

We need not attempt, in the present case, to draw comprehensive distinctions for general application. Our focus is on one type of serious physical injury—serious disfigurement. See General Statutes § 53a-3 (4).

We begin by examining the foundational term "disfigurement." Our Penal Code does not define this term. Neither did New York's Penal Code, from which our code's relevant definitions and many of its core provisions, such as our assault provisions, were drawn. See, e.g., *State* v. *Courchesne*, 296 Conn. 622, 671–73, 998 A.2d 1 (2010); *State* v. *Havican*, 213 Conn. 593, 601, 569 A.2d 1089 (1990); Conn. Joint Standing Committee Hearings, Judiciary, Pt. 1, 1969 Sess., p. 11; Report of the Commission to Revise the Criminal Statutes (1967) pp. 114–15, reprinted in 1 Law and Legislative Reference Unit, Connecticut State Library, Connecticut Legislative Histories Landmark Series: 1969 Public Act No. 828 (2005). Under the common meaning at the time our code was adopted in 1969, "disfigurement" was defined

simply as "something that disfigures, as a scar." The Random House Dictionary of the English Language (Unabridged Ed. 1966) p. 411. "Disfigure," in turn, was commonly defined as "to mar the appearance or beauty of; deform"; id.; "to spoil the appearance of"; Webster's Seventh New Collegiate Dictionary (1969) p. 239; or "to deform; to impair, as shape or form; to mar; to deface; to injure the appearance or attractiveness of . . . ." Webster's New Twentieth Century Dictionary (2d Ed. 1964) p. 524. Legal dictionaries of the day reflected a similar definition for "disfigurement" that had been adopted under workers' compensation law in some jurisdictions: "That which impairs or injures the beauty, symmetry, or appearance of a person . . . that which renders unsightly, misshapen, or imperfect, or deforms in some manner." Black's Law Dictionary (4th Ed. 1968) p. 554; accord Ballentine's Law Dictionary (3d Ed. 1969) p. 554. Our legislature subsequently adopted a substantially similar definition for our workers' compensation scheme. See Public Acts 1991, No. 91-339, § 1, codified as amended at General Statutes § 31-275 (8) (" '[d]isfigurement' means impairment of or injury to the beauty, symmetry or appearance of a person that renders the person unsightly, misshapen or imperfect, or deforms the person in some manner, or otherwise causes a detrimental change in the external form of the person").

Although this court has not previously considered whether this statutory definition would apply to the Penal Code, we note that every other jurisdiction that has considered the term's meaning as applied to penal statutes generally or assault provisions specifically, including New York, has adopted a definition of disfigurement that largely conforms to our workers' compensation definition.[9] Therefore, we conclude that this meaning should apply to our Penal Code. See General Statutes § 1-1 (a) (directing that words that have acquired particular and appropriate meaning in law be construed as such and otherwise be construed in accordance with commonly approved usage).

We next consider the difference between disfigurement and *serious* disfigurement. At the time of the Penal Code's adoption, the common meaning of "serious," specifically in relation to injury, was "having important or dangerous possible consequences . . . ." Webster's Seventh New Collegiate Dictionary, supra, p. 792. Other jurisdictions have applied similar definitions to "serious" as a modifier to "disfigurement" in their penal statutes:[10] "grave, or great"; *Williams* v. *State*, 248 Ga. App. 316, 318, 546 S.E.2d 74 (2001); "giving cause for apprehension; critical"; *State* v. *Silva*, 75 Haw. 419, 434, 864 P.2d 583 (1993); "grave and not trivial in quality or manner." *State* v. *Clark*, 974 A.2d 558, 573 (R.I. 2009).

Thus, just as inflicting serious physical injury is deemed to be conduct of significantly greater culpability than inflicting physical injury, it is evident that " 'to

disfigure . . . seriously' must be to inflict some harm substantially greater than the minimum required for 'disfigurement.' " *People* v. *McKinnon*, 15 N.Y.3d 311, 315, 937 N.E.2d 524, 910 N.Y.S.2d 767 (2010). Other jurisdictions that have given a unified definition to serious disfigurement under their penal laws, rather than define each word separately, have defined it as " 'an injury [that] mars the [victim's] physical appearance and causes a degree of unattractiveness sufficient to bring negative attention or embarrassment' "; *Akaran* v. *State*, Docket No. A-8690, 2005 WL 1026992, *4 (Alaska App. May 4, 2005); an injury that would "make the victim's appearance distressing or objectionable to a reasonable person observing her"; *People* v. *McKinnon*, supra, 316; or a "significant cosmetic deformity caused by the injury." *Hernandez* v. *State*, 946 S.W.2d 108, 113 (Tex. App. 1997). Cf. *People* v. *McKinnon*, supra, 315 (explaining that "serious" disfigurement would not rise to level of "severe" disfigurement, such that it need not be " 'abhorrently distressing, highly objectionable, shocking or extremely unsightly' to a reasonable person"). In defining a similar term in our workers' compensation scheme, our legislature defined "significant disfigurement" as "any disfigurement that is of such a character that it substantially detracts from the appearance of the person bearing the disfigurement."[11] Public Acts 1991, No. 91-339, § 1, codified at General Statutes (Rev. to 1993) § 31-275 (8). Because "serious" means, at a minimum, "significant"; see Webster's Seventh New Collegiate Dictionary, supra, pp. 792, 809 (defining "serious" as "having important or dangerous possible consequences," and "significant" as "important, weighty"); see also *Fisher* v. *Blankenship*, 286 Mich. App. 54, 66, 777 N.W.2d 469 (2009) (disfigurement will be considered serious if it is significant); we also conclude that applying a similar definition to the Penal Code would be appropriate.

In considering how to apply this definition to the evidence in a given case, the present case requires consideration of whether, and the extent to which, the duration of the disfigurement is relevant. Unlike many other jurisdictions, our Penal Code does not expressly require an injury to persist for any particular duration to qualify as a serious physical injury, including serious disfigurement. See footnote 11 of this opinion. Early drafts of our Penal Code defined "serious physical injury" to include "serious *and protracted* disfigurement, *protracted* impairment of health or *protracted* loss or impairment of any of the bodily functions." (Emphasis added.) Report of the Commission to Revise the Criminal Statutes, supra, p. 6; Proposed House Bill No. 7182, § 4 (4), 1969 Jan. Sess. In the substitute bill that was favorably reported out of committee, "serious" was substituted for "protracted" where the former had not been included; see Substitute House Bill No. 7182, 1969 Sess.; without explanation.

We do not view this change to mean that the duration of the injury is not a proper consideration under § 53a-59 (a) (1). The term "serious" is broader than "prolonged" in that it covers more than only the temporal dimension, and it would appear that the legislature decided that the broader term was all that was necessary. See *State* v. *Bledsoe*, 920 S.W.2d 538, 540 (Mo. App. 1996) ("[a]lthough no longer statutorily required . . . permanency of disfigurement is relevant, as a matter of evidence, on the element of seriousness" [citations omitted]). For example, a transitory blemish to one's appearance that heals without medical treatment (e.g., a bruise, an abrasion) could hardly be deemed serious disfigurement. See *Williams* v. *State*, supra, 248 Ga. App. 319 ("[i]n every aggravated battery based upon a serious disfigurement, including those in which the disfigurement was temporary, the injury inflicted was more than a superficial wound, that is, a scrape, bruise, discoloration, or swelling"). Conversely, injuries of more lasting duration are more likely to be serious, even when they heal without medical intervention.[12] See, e.g., *State* v. *Barretta*, 82 Conn. App. 684, 689–90, 846 A.2d 946 (there was sufficient evidence to establish serious disfigurement when, as result of being viciously beaten with baseball bat, victim sustained contusions, severe bruising, and abrasions all over his body), cert. denied, 270 Conn. 905, 853 A.2d 522 (2004); *State* v. *Hughes*, 469 S.W.3d 894, 901 (Mo. App. 2015) (there was sufficient evidence to establish serious disfigurement when victim was badly beaten in assault, but injuries would all heal: victim had black eye, swollen eye barely open, bruising around neck from scarf used to choke her, bruising and discoloration on both cheeks, scratches on right side of mouth, and abrasions to lip).

In the same way that permanence is not a necessary condition for serious disfigurement; cf. General Statutes § 53a-59 (a) (2) (intent and effect of disfiguring another person "seriously *and permanently*" is one basis of assault in first degree [emphasis added]);[13] neither is it a sufficient condition, in and of itself, to establish serious disfigurement. We are mindful that some of our Appellate Court's decisions appear to suggest that, whenever a defendant inflicts an injury that leaves a permanent scar, the evidence would be sufficient to permit the trier of fact to determine that serious disfigurement exists. See, e.g., *State* v. *Griffin*, 78 Conn. App. 646, 655 n.3, 828 A.2d 651 (2003) ("[a] permanent scar constitutes serious and permanent disfigurement"). But see *State* v. *Huckabee*, 41 Conn. App. 565, 570–71, 677 A.2d 452 ("[a] bullet wound is not per se serious physical injury"), cert. denied, 239 Conn. 903, 682 A.2d 1009 (1996). We agree with those jurisdictions that have recognized that, because any visible scar would mar the victim's appearance and thus constitute disfigurement, the legislative choice of "serious" disfigurement evidences an intent to require the presence of some other

factor(s) in addition to permanence to render a scar a "serious" disfigurement. See, e.g., *Saelee* v. *State*, Docket No. A-10004, 2011 WL 807391, *9 (Alaska App. March 2, 2011) ("Even in the photographic exhibit, it is difficult to see this scar if one is not looking closely. If we were to declare this evidence sufficient to establish a 'serious and protracted disfigurement,' we would essentially be saying that any visible scar constitutes a 'serious physical injury' for purposes of the assault statutes. We do not believe that the legislature intended this term to be interpreted so broadly."); *State* v. *Silva*, supra, 75 Haw. 433 ("[E]ven a small but noticeable scar on a person's face, for example, is a disfigurement. However, such a scar would certainly not qualify as a 'serious bodily injury' under the statutory definition nor should it."); *Hernandez* v. *State*, supra, 946 S.W.2d 113 ("Simply that an injury causes a scar is not sufficient to establish serious permanent disfigurement. . . . There must be evidence of some significant cosmetic deformity caused by the injury." [Citation omitted.]); see also *State* v. *Hanes*, 790 N.W.2d 545, 554 (Iowa 2010) ("[s]carring may in some circumstances rise to the level of serious permanent disfigurement"); *State* v. *Bledsoe*, supra, 920 S.W.2d 540 ("permanency of disfigurement is relevant . . . on the element of seriousness").

Factors identified by other jurisdictions as relevant to the seriousness of a disfigurement in the form of a scar include its permanence, but also its location, size, and general appearance. See, e.g., *State* v. *Roper*, 136 S.W.3d 891, 898 (Mo. App. 2004); *State* v. *Demers*, Docket No. CX-03-297, 2003 WL 22952813, *1 (Minn. App. December 16, 2003), review denied, Minnesota Supreme Court (February 25, 2004); *People* v. *McKinnon*, supra, 15 N.Y.3d 316. If there is more than one disfiguring feature, courts, including our Appellate Court, have considered the cumulative effect of those features to assess seriousness. See, e.g., *State* v. *Anderson*, 16 Conn. App. 346, 357, 547 A.2d 1368, cert. denied, 209 Conn. 828, 552 A.2d 433 (1988); *Levin* v. *State*, 334 Ga. App. 71, 74, 778 S.E.2d 238 (2015), cert. denied, Georgia Supreme Court, Docket No. S16C0249 (January 11, 2016); *Sloan* v. *State*, Docket No. 49A02-1002-CR-195, 2010 WL 4813600, *2 (Ind. App. November 24, 2010) (decision without published opinion, 937 N.E.2d 938 [Ind. App. 2010]); *State* v. *Roper*, supra, 898. Similar factors have been identified under our workers' compensation scheme. See General Statutes § 31-308 (c) ("[i]n making any award under this subsection, the commissioner shall consider [1] the location of the scar or disfigurement, [2] the size of the scar or disfigurement, [3] the visibility of the scar or disfigurement due to hyperpigmentation or depigmentation, whether hypertrophic or keloidal, [4] whether the scar or disfigurement causes a tonal or textural skin change, causes loss of symmetry of the affected area or results in noticeable

bumps or depressions in the affected area, and [5] other relevant factors").

On the basis of the foregoing analysis, we discern the following distinction between disfigurement and serious disfigurement. "Disfigurement" means impairment of or injury to the beauty, symmetry or appearance of a person that renders the person unsightly, misshapen or imperfect, or deforms the person in some manner, or otherwise causes a detrimental change in the external form of the person. "Serious disfigurement" is an impairment of or injury to the beauty, symmetry or appearance of a person of a magnitude that substantially detracts from the person's appearance from the perspective of an objective observer. In assessing whether an impairment or injury constitutes serious disfigurement, factors that may be considered include the duration of the disfigurement, as well as its location, size, and overall appearance. Serious disfigurement does not necessarily have to be permanent or in a location that is readily visible to others.[14] The jury is not bound by any strict formula in weighing these factors, as a highly prominent scar in a less visible location may constitute serious disfigurement, just as a less prominent scar in a more visible location, especially one's face, may constitute serious disfigurement.

With these principles in mind, we turn to the defendant's claim that the evidence in the present case is insufficient to establish that Bran suffered a "serious physical injury" in the form of "serious disfigurement." Although ordinarily a factual question for the jury; see, e.g., *State* v. *Almeda*, supra, 211 Conn. 450; *State* v. *Miller*, 202 Conn. 463, 489, 522 A.2d 249 (1987); there is a legal distinction between physical injury and serious physical injury that is not a purely subjective matter, and it is ultimately our responsibility to draw that line. See *State* v. *Rossier*, 175 Conn. 204, 207, 397 A.2d 110 (1978) ("[a]lthough it may often be difficult to distinguish between [physical injury and serious physical injury], such a distinction *must be drawn*" before defendant can be found guilty of assault in first degree under § 53a-59 [a] [1] [emphasis added]); *State* v. *Jeustiniano*, 172 Conn. 275, 281, 374 A.2d 209 (1977) ("[t]he degree of the injuries suffered by [the victim] was a proper question for the jury to decide if sufficient evidence were introduced"); *Hernandez* v. *State*, supra, 946 S.W.2d 113 ("Disfigurement, like beauty, is in the eye of the beholder. However, when distinguishing between 'bodily injury' and 'serious bodily injury' it is, again, a matter of degree. Simply that an injury causes a scar is not sufficient to establish serious permanent disfigurement. . . . There must be evidence of some significant cosmetic deformity caused by the injury." [Citation omitted.]).

"In reviewing the [legal] sufficiency of the evidence concerning this element of assault in the first degree,

our task is to construe the evidence in the light most favorable to sustaining the jury's verdict, and then to determine whether any rational trier of fact could have found that the harm suffered rose to the level of a serious physical injury under the statute." (Internal quotation marks omitted.) *State* v. *Almeda*, supra, 211 Conn. 450; accord *State* v. *Adams*, 327 Conn. 297, 304–305, 173 A.3d 943 (2017).

The evidence regarding Bran's injuries principally came from the testimony of her treating physician at the hospital and two sets of photographs of the injured area: one set taken shortly after medical treatment was rendered and the other set taken thirty months later, at the time of trial. Each set included one photograph magnifying the injuries at close range and one photograph in which Bran displayed the injured area of her arm, taken from a sufficient distance to capture the area from Bran's upper torso to her head. Bran's physician testified that the scar would remain in its present condition.

Bran testified that she was unaware that she had been cut until her son told her that she was bleeding. Her only testimony relating to the appearance of her injury was her agreement that the photographs taken after treatment accurately depicted her condition at that time and her estimation of the approximate size of the scar at the time of trial. No testimony was provided regarding the impact of the scar on her appearance. The state opted not to have Bran display her scar to the jury directly, presenting the contemporaneous photographs instead.

The evidence collectively established the following undisputed facts. Immediately following the incident, Bran had an approximately 1.38 inch (three and one-half centimeters) abrasion and an approximately 0.30 inch (three-quarters of one centimeter) laceration just above her left elbow. Just below her left elbow, on her forearm, Bran had an approximately 1.57 inch (four centimeter) laceration. The smaller laceration was closed with a single suture; the larger laceration was closed with ten sutures. The closed lacerations appear quite narrow.[15] By the time of trial, the larger of the two lacerations had left a scar approximately the same length as the laceration, although it appears to be slightly wider in the magnified close-up than when sutured. The scar is a slightly lighter tone than the surrounding skin. No other injury is apparent.

Our application of the factors previously identified as relevant to assessing whether the victim has sustained a serious disfigurement establishes that Bran sustained a disfigurement, in the form of a permanent scar. That scar is in a location that could be seen if Bran wears anything shorter than a three-quarter sleeve top. The scar is not, however, in a prominent location such as her face or neck.[16] It is relatively small in size, uniform

in shape (a straight line), and otherwise unremarkable in its general appearance. Although the scar is visible if one looks for it, in the photograph that appears to have been taken from a distance of normal social interaction, its appearance is not such that one's eye naturally would be drawn to it. Serious disfigurement requires something more than visibility, as it must be visible to mar one's appearance and, hence, meet the threshold for disfigurement. See *Akaran* v. *State*, supra, 2005 WL 1026992, \*3 (noting that "courts agree that if a scar is observable from a normal social distance, it constitutes a disfigurement," and then considering whether scar is also serious disfigurement); *Thomas* v. *State*, 128 Md. App. 274, 303, 737 A.2d 622 ("[d]isfigurement is generally regarded as an externally *visible* blemish or scar that impairs one's appearance" [emphasis added]), cert. denied, 357 Md. 192, 742 A.2d 521 (1999).

This evidence compels the conclusion that the disfigurement is not of a magnitude that objectively could be found to *substantially* detract from Bran's appearance. We hold that the evidence is not legally sufficient to meet the threshold for serious disfigurement.

We note that, while no two cases are precisely the same, other jurisdictions considering a single scar of roughly similar size, location, and/or appearance as the one in the present case have concluded that the evidence did not rise to the level of serious disfigurement. See, e.g., *Vo* v. *State*, 612 So. 2d 1323, 1325 (Ala. App. 1992) (bullet wound through arm was not serious physical injury), cert. denied, Alabama Supreme Court, Docket No. 1920350 (February 19, 1993); *Davis* v. *State*, 467 So. 2d 265, 266–67 (Ala. App. 1985) (scars on victim's hand from bullet going through it was not serious disfigurement); *McDaniel* v. *Commonwealth*, 415 S.W.3d 643, 659 (Ky. 2013) (small scar on victim's wrist from bullet wound, barely visible in video, was not serious disfigurement, consistent with cases in which court previously held that scar from small stab wound was not serious disfigurement); *People* v. *Stewart*, 18 N.Y.3d 831, 832, 962 N.E.2d 764, 939 N.Y.S.2d 273 (2011) (six to seven centimeter [approximately two and one-half inch] wound on victim's inner forearm requiring sutures was not shown to be objectively distressing or objectionable so as to justify conclusion that it constituted serious disfigurement predicate for first degree assault); *People* v. *McKinnon*, supra, 15 N.Y.3d 316 (two scars of moderate size on victim's inner forearm were not serious disfigurement, in absence of evidence that there was something unusually disturbing about scars); *Bueno* v. *State*, 996 S.W.2d 406, 408 (Tex. App. 1999) (two inch scar on abdomen was not sufficient to show serious, permanent disfigurement); *Hernandez* v. *State*, supra, 946 S.W.2d 113 (one inch scar on abdomen did not amount to serious, permanent disfigurement); *McCoy* v. *State*, 932 S.W.2d 720, 724 (Tex. App. 1996) (scar on victim's lip that was permanent but not visible unless

individual looked for it was not sufficient to constitute serious, permanent disfigurement). But cf. *Sloan* v. *State*, supra, 2010 WL 4813600, *1–2 (five scars from stab wounds in left arm and shoulder were sufficient evidence of serious, permanent disfigurement); *Thomas* v. *State*, supra, 128 Md. App. 303 (court could not conclude that there was insufficient evidence of serious physical injury as result of bite wound on arm that left scar because court did not see scar and, therefore, could not say that reasonable jurors who did see it could not conclude that it was serious, permanent/protracted disfigurement); *State* v. *Williams*, 784 S.W.2d 309, 311 (Mo. App. 1990) (three inch laceration to victim's neck, described in hospital record as superficial, was held to constitute serious disfigurement due to keloid formation of scar tissue); *State* v. *Pettis*, 748 S.W.2d 793, 794 (Mo. App. 1988) (four inch scar on arm constituted serious disfigurement); *State* v. *Williams*, 740 S.W.2d 244, 246 (Mo. App. 1987) (five inch wound on neck with resulting hypertrophic, or elevated, scar was held to constitute serious disfigurement); *People* v. *Ahearn*, 88 App. Div. 2d 691, 692, 451 N.Y.S.2d 318 (1982) ("[i]t is reasonable to characterize the *extensive* permanent scar [on the victim's arm] as a 'serious and protracted disfigurement' " [emphasis added]).

These cases reflect that, even though no bright line can be drawn between simple disfigurement and serious disfigurement, the courts have a role in ensuring that the evidence meets a minimum threshold that distinguishes the two. When reasonable minds could disagree as to the side of the line on which the injury falls, it would be improper for this court to act as a seventh juror and to substitute its own view for that of the jury. However, this is not such a case.

Although the state framed its disfigurement argument to the jury solely in reference to Bran's scar at the time of trial, it asserts in its brief to this court that the jury also was free to consider the appearance of Bran's injuries when inflicted, and properly could have rendered its verdict on that basis. We agree that, in assessing the seriousness of the disfigurement, the jury was not limited to considering the injury in its final, fully healed state. See, e.g., *State* v. *Barretta*, supra, 82 Conn. App. 686, 688–90 (contusions and severe bruising all over body from beating with baseball bat established serious disfigurement). But we are not persuaded that this perspective changes the outcome. The nature of the injury on Bran's arm at the time it was inflicted and at the time of the trial was not significantly different. The forearm laceration was appreciably more apparent immediately after the wound was sutured than after it healed, but it still retained the relatively undistinguishing features previously discussed.[17] Consequently, this evidence also was legally insufficient to support a finding of serious disfigurement.

We emphasize that, in concluding that the evidence was not legally sufficient to establish that the defendant caused Bran to suffer serious disfigurement, we do not intend to trivialize the assault or the physical legacy of it that remains with Bran. However, it is clear that the state failed to prove beyond a reasonable doubt that the defendant committed assault in the first degree by inflicting serious physical injury on Bran with a dangerous instrument. Therefore, the defendant's conviction of that charge must be reversed.

## II

In light of this determination, we must consider the state's contention that we should not direct a judgment of acquittal on this charge but, instead, that the judgment should be modified to reflect the highest lesser included offense that requires only physical injury, not serious physical injury, i.e., assault in the second degree in violation of § 53a-60 (a) (2),[18] and the defendant should be resentenced accordingly. The state concedes that, under *State* v. *LaFleur*, supra, 307 Conn. 115, the judgment of conviction must be reversed. It contends, however, that we should reconsider this precedent—despite its relatively recent vintage—because its reasoning is unsound. The state asks us, instead, to overrule *LaFleur* in favor of a rule under which a conviction suffering from evidentiary insufficiency would be modified to the highest lesser included offense supported by the evidence, unless the defendant can prove that the absence of a jury instruction on that lesser included offense was prejudicial. The state contends that the fact that the jury was never charged on the lesser offense does not demonstrate such prejudice because, by finding that the evidence supported all the elements of the greater offense, the jury necessarily found that the evidence supported the elements of the lesser included offense. We decline to overrule *LaFleur*.

Our decision in *LaFleur* hewed closely to the analysis applied in *State* v. *Sanseverino*, 291 Conn. 574, 969 A.2d 710 (2009). That case involved an instructional error based on a posttrial change to our long-standing interpretation of the kidnapping statute under which the defendant was convicted. Id., 577–78, 595. In light of that error, this court considered the state's contention that, if it elected not to retry the defendant on the kidnapping charge, it would be entitled to a modification of the judgment to reflect the lesser included offense of unlawful restraint in the second degree. Id., 590. The court noted a split of authority in state and federal courts as to whether modification is proper if the jury had not been instructed on the lesser included offense, as was the case in *Sanseverino*. Id., 593. One group held that modification is never proper under those circumstances; the other group held that modification is proper as long as there is no prejudice to the defendant. Id., 593–94. This court concluded in *Sansev-*

*erino* that, "[u]nder the unique circumstances" of the case; id., 595; the judgment could be modified to reflect the lesser included offense because (1) there was no reason to believe that the state had opted against seeking a jury instruction on that lesser included offense for strategic purposes (because our precedent was so well settled), (2) the defendant had benefited from our holding in the case that had overruled precedent, even though he had not raised a claim challenging that precedent, (3) the defendant had not objected to the state's request for a modification of the judgment, and (4) we could conceive of no reason why it would be unfair to the defendant to impose a conviction of unlawful restraint in the second degree (given the preceding circumstances and the fact that the jury "*necessarily*" found the defendant guilty of the lesser included offense by finding him guilty of the greater offense). (Emphasis in original.) Id., 595 and 596 n.17.

Three years later, in *LaFleur*, this court similarly was faced with the question of whether instructional error on an element of assault in the first degree required the conviction to be reversed or the judgment to be modified to the lesser included offense of assault in the second degree when the jury had not been instructed on that lesser offense. *State* v. *LaFleur*, supra, 307 Conn. 140–42. The instructional error in *LaFleur* stemmed from an issue of first impression, whether a fist is a "dangerous instrument." Id., 140. In a closely divided decision, this court concluded that modification was not appropriate. Id., 153–54; id., 164-85 (*Palmer, J.*, dissenting). The majority pointed to the split of authority on this issue that had been acknowledged in *Sanseverino*. Id., 142–43. It rejected the approach of the courts permitting modification in the absence of evidence of undue prejudice to the defendant because that approach did not give any weight to the fact that the jury had not been charged on the lesser included offense, and did not consider that the state may have had a strategic reason for not requesting the lesser charge. Id., 145–47. Ultimately, the majority in *LaFleur* looked to the circumstances that justified modification in *Sanseverino* and concluded that, because these circumstances were not present in *LaFleur*, the court could not conclude that it would be fair to the defendant to allow modification. Id., 147–51.

The majority cited several reasons why, in the absence of those unusual circumstances, a court should not modify a conviction when the state did not request a charge on the lesser included offense: "First, an appellate court does not sit as a [fact finder] in a criminal case and should avoid resolving cases in a manner [that] appears to place the appellate court in the jury box. . . .

"Second . . . this view preserves the important distinction between an appellate determination [that] the record contains sufficient evidence to support a guilty

verdict and a jury determination [that] the [s]tate proved its case beyond a reasonable doubt. . . .

"Third, when [a jury instruction on the lesser offense has been given] . . . it can be said with some degree of certainty that a [sentencing remand] is but effecting the will of the fact finder within the limitations imposed by law . . . and . . . that the appellate court is simply passing on the sufficiency of the implied verdict. When, however, no instruction at all has been offered on the lesser offense, second guessing the jury becomes far more speculative. . . .

"Fourth, when the jury could have explicitly returned a verdict on the lesser offense, the defendant is well aware of his potential liability for the lesser offense and usually will not be prejudiced by the modification of the judgment from the greater to the lesser offense. . . .

"Fifth, adopting a practice of remanding for sentencing on a lesser included offense when that offense has not been submitted to the jury may prompt the [s]tate to avoid requesting or agreeing to submit a lesser included offense to the jury. . . .

"Sixth, the [s]tate would obtain an unfair and improper strategic advantage if it successfully prevents the jury from considering a lesser included offense by adopting an all or nothing approach at trial, but then on appeal, perhaps recognizing [that] the evidence will not support a conviction [of] the greater offense, is allowed to abandon its trial position and essentially concede [that] the lesser included offense should have been submitted to the jury. . . .

"Seventh . . . [t]he defendant may well have [forgone] a particular defense or strategy due to the trial [court's] rejection of a lesser included offense." (Internal quotation marks omitted.) Id., 152 n.30, quoting *State* v. *Brown*, 360 S.C. 581, 594–97, 602 S.E.2d 392 (2004); see *State* v. *Brown*, supra, 594–97 (explaining why charge on lesser included offense is necessary prerequisite to modification).

The majority's analysis in *LaFleur* resulted in two notable clarifications of the *Sanseverino* factors. First, the majority effectively determined that it would presume that the state's failure to request an instruction on the lesser included offense was strategic unless the evidentiary deficiency resulted from an unforeseeable change in the law, not merely the resolution of an issue of first impression, such that the state could not have anticipated the change. Id., 147. Second, it effectively presumed that the absence of an instruction on the lesser included offense prejudiced the defendant: "Regardless of whether the defense challenged the state's claims as to elements of the lesser included charge, trial strategy and jury deliberations are *inevitably* colored by the inclusion of a lesser included charge to the jury." (Emphasis added.) Id., 151.

The dissent in *LaFleur* argued that the *Sanseverino* factors were never intended to apply as a general framework for assessing whether modification of the judgment is proper in the absence of a jury charge on the lesser included offense. Id., 166–67 (*Palmer, J.*, dissenting). It contended that, as a general matter, modification is not unfair to the defendant in such cases because the greater offense puts the defendant on notice of the lesser offense and a jury finding on the greater offense necessarily means that the jury finds the elements of the lesser offense satisfied. Id., 168, 173–74 (*Palmer, J.*, dissenting). The dissent contended that, unless the defendant can offer a legitimate reason why it would be unfair to sentence him to the lesser included offense, modification of the judgment achieves the result most consonant with justice. Id., 166, 173–81 (*Palmer, J.*, dissenting). It criticized the majority for purporting to reject a bright line rule when, in reality, it had adopted one, asserting that the state will be unable to prove either that its failure to seek an instruction on the lesser included offense was not strategic or that the defendant would not have altered his trial strategy had such an instruction been given. Id., 173 (*Palmer, J.*, dissenting).

Having thus provided a comprehensive review of the precedent that the state seeks to overrule, we must consider whether the prudential doctrine of stare decisis counsels against that action. Stare decisis "counsels that a court should not overrule its earlier decisions unless the most cogent reasons and inescapable logic require it. . . . Stare decisis is justified because it allows for predictability in the ordering of conduct, it promotes the necessary perception that the law is relatively unchanging, it saves resources and it promotes judicial efficiency." (Internal quotation marks omitted.) *Graham* v. *Commissioner of Transportation*, 330 Conn. 400, 417, 195 A.3d 664 (2018). "While stare decisis is not an inexorable command . . . the doctrine carries such persuasive force that we have always required a departure from precedent to be supported by some special justification. . . . *Dickerson* v. *United States*, 530 U.S. 428, 443, 120 S. Ct. 2326, 147 L. Ed. 2d 405 (2000). Such justifications include the advent of subsequent changes or development in the law that undermine[s] a decision's rationale . . . the need to bring [a decision] into agreement with experience and with facts newly ascertained . . . and a showing that a particular precedent has become a detriment to coherence and consistency in the law . . . ." (Internal quotation marks omitted.) *Sepega* v. *DeLaura*, 326 Conn. 788, 798–99 n.5, 167 A.3d 916 (2017). "When a prior decision is seen so clearly as error that its enforcement [is] for that very reason doomed . . . the court should seriously consider whether the goals of stare decisis are outweighed, rather than dictated, by the prudential and pragmatic considerations that inform the doctrine to

enforce a clearly erroneous decision." (Citation omitted; internal quotation marks omitted.) *Conway* v. *Wilton*, 238 Conn. 653, 659, 680 A.2d 242 (1996). In making this determination, the court should consider whether the parties acted in reliance on the rule at issue. See *Spiotti* v. *Wolcott*, 326 Conn. 190, 202–203, 163 A.3d 46 (2017) ("a departure from precedent may be justified when the rule to be discarded may not be reasonably supposed to have determined the conduct of the litigants" [internal quotation marks omitted]).

We are not persuaded that the state has provided a sufficient justification for overruling *LaFleur*. The state's reasons mirror those made by the dissent in *LaFleur*, which did not carry the day. The state does not argue that the split among both federal and state courts on this issue has evolved to a greater consensus favoring modification. The very fact that reasonable jurists disagree on this matter suggests that *LaFleur* has not been proven "clearly" wrong.

Nor is there any evidence that the rule in *LaFleur* is unworkable. If the state wants to avoid the possibility that the evidence will be deemed insufficient to support the charge, whether by the jury or a reviewing court, it can simply request an instruction on any lesser included offense supported by the evidence. In fact, we agree with the dissent in *LaFleur* that the practical effect of the majority's analysis is a bright line rule.

Reliance interests also favor application of the holding in *LaFleur* to the present case. Both parties were on notice at trial that *LaFleur* was the controlling law. Knowing this, the state chose to gamble that the evidence would be found factually and legally sufficient to support a conviction of assault in the first degree as to both victims, despite the obvious disparity in the seriousness of their injuries. It is fair to presume, under these circumstances, that the defendant believed that the evidence was insufficient to support a charge of assault in the first degree as to Bran and that, in the absence an instruction on a lesser included offense, either (a) the jury would find him not guilty; see *Fair* v. *Warden*, 211 Conn. 398, 404, 559 A.2d 1094 ("[i]t may be sound trial strategy not to request a lesser included offense instruction, hoping that the jury will simply return a not guilty verdict"), cert. denied, 493 U.S. 981, 110 S. Ct. 512, 107 L. Ed. 2d 514 (1989); or (b) his conviction would be vacated under *LaFleur*. It would be unfair to the defendant to change the law on appeal. Had he known that the judgment would be modified if he succeeded on his evidentiary sufficiency challenge, he might have sought an instruction not only on assault in the second degree, a class D felony, but also on assault in the third degree, a class A misdemeanor. See General Statutes §§ 53a-60 (a) (2) and (b) and 53a-61.[19] Under our law, the defendant would have been entitled to instructions all the way down to the lowest offense

supported by the evidence. See, e.g., *State* v. *Vasquez*, 176 Conn. 239, 241, 244, 405 A.2d 662 (1978) (when information charged defendant with robbery in first degree, he was entitled to jury charge on robbery in second degree, robbery in third degree, and larceny in fourth degree on ground that those offenses are lesser included crimes of robbery in first degree). We conclude, therefore, that the state has not provided a substantial justification for departing from the holding in *LaFleur*.

The state contends, however, that there is evidence here, unlike in *LaFleur*, to establish that the defendant was not prejudiced by the lack of an instruction on the lesser included offense of assault in the second degree. The state points to the fact that the defendant submitted proposed jury instructions on the first day of evidence that included a request to charge on assault in the second degree with respect to Bran but that he withdrew that request at the charging conference at the close of evidence.[20] Given this timing, the state claims that "the defendant put on his entire defense anticipating that a lesser charge would be given before withdrawing the request" and, therefore, could not have been prejudiced by the absence of the instruction. We disagree. The timing of the withdrawal does not necessarily correlate to the timing of the defendant's decision, as there was no need to inform the court of that decision prior to the charging conference. The defendant may have made that determination during or at the close of the state's case-in-chief, after it likely became apparent that the state's proof as to Bran fell short of the evidence needed for a conviction of assault in the first degree. Moreover, as previously noted, had the state sought an instruction on assault in the second degree at the charging conference, the defendant might have requested a charge on a still lesser offense.

We therefore conclude that the defendant's conviction of assault in the first degree as to Bran must be reversed. In light of this determination, one further observation is warranted. "This court has endorsed the . . . aggregate package theory of sentencing. . . . Pursuant to that theory, we must vacate a sentence in its entirety when we invalidate any part of the total sentence. On remand, the resentencing court may reconstruct the sentencing package or, alternatively, leave the sentence for the remaining valid conviction or convictions intact. . . . Thus, we must remand this case for resentencing on the sole [count] on which the defendant stands convicted." (Citation omitted; internal quotation marks omitted.) *State* v. *LaFleur*, supra, 307 Conn. 164.

The judgment of the Appellate Court is reversed only with respect to the conviction of assault in the first degree as to Bran and the case is remanded to that court with direction to remand the case to the trial

court with direction to render judgment of acquittal on that charge, to vacate the defendant's sentence, and to resentence him on the remaining charge; the judgment of the Appellate Court is affirmed in all other respects.

In this opinion KAHN and ECKER, Js., concurred.

[1] An exception, not relevant to the present case, arises when a defendant inflicts physical injury by means of the discharge of a firearm. See footnote 2 of this opinion.

[2] General Statutes § 53a-59 (a) provides: "A person is guilty of assault in the first degree when: (1*) With intent to cause serious physical injury to another person*, *he causes such injury to such person or to a third person by means of a deadly weapon or a dangerous instrument*; or (2) with intent to disfigure another person seriously and permanently, or to destroy, amputate or disable permanently a member or organ of his body, he causes such injury to such person or to a third person; or (3) under circumstances evincing an extreme indifference to human life he recklessly engages in conduct which creates a risk of death to another person, and thereby causes serious physical injury to another person; or (4) with intent to cause serious physical injury to another person and while aided by two or more other persons actually present, he causes such injury to such person or to a third person; or (5) with intent to cause physical injury to another person, he causes such injury to such person or to a third person by means of the discharge of a firearm." (Emphasis added.)

[3] Raphael was in critical condition when he was admitted to the hospital. *State* v. *Petion*, supra, 172 Conn. App. 672 n.2. His injuries required immediate surgery and resulted in permanent scarring and nerve damage to his face. Id.

[4] Bran's treating physician testified that Bran's vital signs—blood pressure and respiratory rate—were "grossly abnormal" when he first had contact with her but acknowledged that the elevated levels were a function of adrenaline when someone is injured. He offered no testimony as to whether or how long these levels were sustained; nor did he suggest that these levels created a substantial risk of death, or caused a serious impairment of health or serious loss or impairment of the function of any bodily organ. See General Statutes § 53a-3 (4) (defining serious physical injury). Bran was not admitted to the hospital for observation and received no treatment other than sutures for the lacerations.

[5] The defendant challenged the sufficiency of the evidence only with respect to the assault charge involving Bran. The defendant contended that prosecutorial improprieties deprived him of a fair trial with respect to the charges of assault as to both Raphael and Bran. The Appellate Court rejected that claim; see *State* v. *Petion*, supra, 172 Conn. App. 678; and the defendant has not challenged that aspect of the court's decision.

[6] Although the trial court's charge provided no such factors to guide the jury, the defendant does not raise a claim of instructional error.

[7] In one earlier case, cited by the Appellate Court in the present case; see *State* v. *Petion*, supra, 172 Conn. App. 674–75; the Appellate Court considered dictionary definitions of "disfigurement" but did not further consider how "serious" modified that meaning. See *State* v. *Barretta*, 82 Conn. App. 684, 689, 846 A.2d 946, cert. denied, 270 Conn. 905, 853 A.2d 522 (2004). By declining to use these cases as benchmarks, we do not intend to express a view as to whether they were correctly decided.

[8] " 'Dangerous instrument' means any instrument, article or substance which, under the circumstances in which it is used or attempted or threatened to be used, is capable of causing death or serious physical injury . . . ." General Statutes § 53a-3 (7).

[9] See, e.g., *Akaran* v. *State*, Docket No. A-8690, 2005 WL 1026992, *4 (Alaska App. May 4, 2005) (defining disfigurement as "an injury [that] mars the [victim's] physical appearance"); *Williams* v. *State*, 248 Ga. App. 316, 318, 546 S.E.2d 74 (2001) (applying definition of disfigurement "as that which impairs or injures the appearance of a person"); *State* v. *Silva*, 75 Haw. 419, 433, 864 P.2d 583 (1993) ("a 'disfigurement' is, in relevant part, 'something that disfigures, as a scar,' while to 'disfigure' is 'to mar the effect or excellence of' "); *James* v. *State*, 755 N.E.2d 226, 230 (Ind. App.) (applying definition of disfigure as " 'to make less complete, perfect or beautiful in appearance or character: deface, deform, mar' "), appeal denied, 761 N.E.2d 423 (Ind. 2001); *Thomas* v. *State*, 128 Md. App. 274, 303, 737 A.2d 622 (applying definition of disfigurement as " 'an externally visible blemish or scar that impairs one's appearance' "), cert. denied, 357 Md. 192, 742 A.2d 521 (1999); *State* v. *Bledsoe*, 920 S.W.2d 538, 540 (Mo. App. 1996) (disfigure "means to

deface or mar the appearance or beauty of someone"); *State* v. *Clark*, 974 A.2d 558, 572 (R.I. 2009) (disfigurement means " 'that which impairs or injures the beauty, symmetry or appearance of a person or thing; that which renders unsightly, misshapen or imperfect or deforms in some manner' "); see also *State* v. *Ferrer*, Docket No. 47687-8-II, 2018 WL 4896669, *2 (Wn. App. October 9, 2018) (trial court instructed jury that "[d]isfigurement means that which impairs or injures the beauty, symmetry or appearance of a person or thing; that which renders unsightly, misshapen, or imperfect, or deforms in some manner" [internal quotation marks omitted]) (decision without published opinion, 5 Wn. App. 2d 1034 [2018]).

[10] Penal laws in the majority of jurisdictions also define serious physical or bodily injury to include serious disfigurement, although many of those jurisdictions add a durational term (e.g., protracted, prolonged, permanent). See Ala. Code § 13A-1-2 (14) (2015) ("serious and protracted disfigurement"); Alaska Stat. § 11.81.900 (b) (58) (B) ("serious and protracted disfigurement") (LexisNexis 2012); Ariz. Rev. Stat. Ann. (Cum. Supp. 2018) § 13-105 (39) ("serious and permanent disfigurement"); Cal. Penal Code § 243 ("serious disfigurement" for purposes of assault statutes) (Deering Supp. 2018); Colo. Rev. Stat. § 18-1-901 (3) (p) (2017) ("substantial risk of serious permanent disfigurement"); Del. Code. Ann. tit. 11, § 222 (26) (Supp. 2012) ("serious and prolonged disfigurement"); Ga. Code Ann. § 16-5-24 (a) (Supp. 2018) ("seriously disfiguring" for purposes of aggravated battery); Haw. Rev. Stat. § 707-700 (2014) ("serious, permanent disfigurement"); Ind. Code Ann. § 35-31.5-2-292 (1) (LexisNexis 2012) ("serious permanent disfigurement"); Iowa Code § 702.18 (2001) ("serious permanent disfigurement"); Ky. Rev. Stat. Ann. § 500.080 (15) (LexisNexis Cum. Supp. 2018) ("serious and prolonged disfigurement"); Me. Rev. Stat. Ann. tit. 17-a, § 2 (23) (Cum. Supp. 2018) ("serious, permanent disfigurement"); Md. Code Ann., Criminal Law § 3-201 (d) (2) (i) (LexisNexis 2012) ("permanent or protracted serious . . . disfigurement"); Mass. Ann. Laws ch. 265, § 13A (c) (LexisNexis 2010) ("permanent disfigurement" for purposes of assault and battery); Minn. Stat. § 609.02 (8) (West 2018) ("serious permanent disfigurement"); Mo. Rev. Stat. § 556.061 (44) (Cum. Supp. 2018) ("serious disfigurement"); Mont. Code Ann. § 45-2-101 (66) (a) (ii) (2017) ("serious permanent disfigurement"); Neb. Rev. Stat. § 21-109 (21) (2016) ("serious permanent disfigurement"); Nev. Rev. Stat. 0.060 (1) (2017) ("serious, permanent disfigurement"); N.J. Stat. Ann. § 2C:11-1 (b) (West 2015) ("serious, permanent disfigurement"); N.M. Stat. Ann. § 30-1-12 (A) (2004) ("serious disfigurement"); N.Y. Penal Law § 10.00 (10) (McKinney Cum. Supp. 2019) ("serious and protracted disfigurement"); N.C. Gen. Stat. 14-32.4 (a) (2017) ("serious permanent disfigurement" for purposes of assault); N.D. Cent. Code § 12.1-01-04 (27) (Supp. 2017) ("serious permanent disfigurement"); Or. Rev. Stat. § 161.015 (8) (2017) ("serious and protracted disfigurement"); 18 Pa. Stat. and Const. Stat. Ann. § 2301 (West 2015) ("serious, permanent disfigurement"); R.I. Gen. Laws § 11-5-2 (c) (Cum. Supp. 2018) ("serious permanent disfigurement"); S.C. Code Ann. § 16-3-600 (A) (1) (2015) ("serious permanent disfigurement"); S.D. Codified Laws § 22-18-1.5 (2017) ("serious permanent disfigurement" for purposes of assault); Tex. Penal Code Ann. § 1.07 (a) (46) (Cum. Supp. 2018) ("serious permanent disfigurement"); Utah Code Ann. § 76-1-601 (11) (LexisNexis 2012) ("serious permanent disfigurement"); Wn. Rev. Code Ann. § 9A.04110 (b) and (c) (West 2015) (substantial bodily harm includes "temporary but substantial disfigurement"; great bodily harm includes "serious permanent disfigurement"); Wis. Stat. § 939.22 (Cum. Supp. 2018) ("serious permanent disfigurement").

Other jurisdictions that define serious physical injury to include disfigurement but do not use the term "serious" include the following: Ark. Code Ann. § 5-1-102 (21) (2013) ("protracted disfigurement"); Idaho Code § 18-907 (West 2016) ("permanent disfigurement" for purposes of aggravated battery); 720 Ill. Comp. Stat. 5/12-3.05 (West 2017) ("permanent . . . disfigurement" for purposes of aggravated battery); Kan. Stat. Ann. § 21-5413 (b) (1) (A) (Cum. Supp. 2018) ("disfigurement" for purposes of aggravated battery); La. Rev. Stat. Ann. § 14:34.7 (B) (3) (2016) ("protracted and obvious disfigurement"); Ohio Rev. Code Ann. § 2901.01 (A) (5) (d) (West Supp. 2018) ("permanent disfigurement" or "temporary, serious disfigurement"); Okla. Stat. Ann. tit. 21, § 646 (B) (West 2018) ("protracted and obvious disfigurement"); Tenn. Code Ann. § 39-11-106 (a) (34) (D) (West 2018) ("protracted or obvious disfigurement"); Wyo. Stat. Ann. § 6-1-104 (x) (C) (2013) ("severe disfigurement").

[11] The legislature repealed this definition when it decided to limit the circumstances under which compensation would be provided for serious

disfigurement or scarring, adding instead language to the statute prescribing those particular limitations. See Public Acts 1993, No. 93-228, §§ 1, 19, codified at General Statutes (Rev. to 1995) § 31-308 (c) (precluding compensation "for any scar or disfigurement which is not located on [A] the face, head or neck, or [B] any other area of the body which handicaps the employee in obtaining or continuing to work").

[12] Although we have no evidence that this substantive consideration motivated the legislature's decision to eliminate "prolonged," the omission of any specific durational requirement raises a question about the impact that surgery has in terms of minimizing the period of disfigurement. In some jurisdictions that require prolonged or permanent disfigurement, courts have considered the seriousness of the condition only after surgery. See, e.g., *State* v. *Malufau*, 80 Haw. 126, 131, 906 P.2d 612 (1995) (under statute requiring serious, permanent disfigurement, court expressed disapproval of case relying on physician's testimony regarding potential severity of victim's injuries in absence of medical treatment); *People* v. *Rosado*, 88 App. Div. 3d 454, 454–55, 930 N.Y.S.2d 10 (2011) (assessing sufficiency of evidence of serious disfigurement in relation to victim's appearance after his broken nose and chipped teeth were repaired by surgery; likelihood, and not possibility, of future adverse impact on appearance was relevant consideration), appeal denied, 18 N.Y.3d 928, 965 N.E.2d 969, 942 N.Y.S.2d 467 (2012). In some other jurisdictions, "the relevant issue was the disfiguring and impairing quality of the bodily injury *as it was inflicted*, not after the effects had been ameliorated or exacerbated by other actions such as medical treatment." (Emphasis in original; internal quotation marks omitted.) *Fancher* v. *State*, 659 S.W.2d 836, 838 (Tex. App. 1983); see, e.g., *Lenzy* v. *State*, 689 S.W.2d 305, 310 (Tex. App. 1985) (concluding that evidence established protracted loss or impairment of function of any bodily member when victim's teeth were fractured and their utility was restored by performance of root canals and installation of porcelain crowns, when dentist's testimony established that, "without his remedial work and treatment, the teeth in question would have been lost or their use substantially impaired"). We note that the former approach would appear to allow the severity of the crime to depend on the fortuity of the level of care that the victim received or was able to afford.

[13] This court has similarly concluded that other forms of serious physical injury need not be permanent. See *State* v. *Ovechka*, supra, 292 Conn. 542 (deeming temporary but grave condition, loss of sight, to be serious physical injury); *State* v. *Barretta*, supra, 82 Conn. App. 684, 689 ("a victim's complete recovery is of no consequence" in assessing whether victim suffered serious physical injury); *State* v. *Denson*, 67 Conn. App. 803, 811, 789 A.2d 1075 ("[i]t is entirely possible to cause serious physical injury without causing . . . a permanent injury"), cert. denied, 260 Conn. 915, 797 A.2d 514 (2002).

[14] The mere fact that a scar is in a location that may be seen only by someone with whom the victim has an intimate relationship would not preclude a finding of serious disfigurement.

[15] The photograph magnifying the laceration at close range shows loose threads from bandages that were removed to reveal the wounds. The width of those threads appears to be roughly the same width as the laceration. No evidence was proffered regarding the depth of the lacerations or their appearance prior to suturing.

[16] We disagree with the Appellate Court's conclusion that the location of Bran's scar made it "no less observable than a facial scar." *State* v. *Petion*, supra, 172 Conn. App. 677. Other courts have recognized as much. See, e.g., *State* v. *Hughes*, supra, 469 S.W.3d 900 ("[v]isibility of scarring, *particularly on the face*, size of scars, and the presence of additional injuries are all factors in determining disfigurement" [emphasis added]).

[17] The state did not produce evidence to establish how long the laceration remained in the condition reflected in the photographs or when the sutures were removed, a fact from which such an inference arguably might be drawn. Although the sutures undoubtedly make Bran's appearance less attractive than after they were removed, the state has not claimed that the jury could properly assess the seriousness of the injury on the basis of the treatment method selected by the victim's physician (e.g., closing a wound with glue, which would not be visible, versus with sutures or some other visible means). Our review of case law from other jurisdictions has not revealed any authority supporting that proposition.

[18] General Statutes § 53a-60 (a) provides in relevant part: "A person is guilty of assault in the second degree when . . . (2) with intent to cause physical injury to another person, the actor causes such injury to such

person or to a third person by means of a deadly weapon or a dangerous instrument other than by means of the discharge of a firearm . . . ."

[19] See footnote 18 of this opinion for the text of § 53a-60 (a) (2). General Statutes § 53a-61 (a) provides in relevant part: "A person is guilty of assault in the third degree when: (1) With intent to cause physical injury to another person, he causes such injury to such person or to a third person . . . or (3) with criminal negligence, he causes physical injury to another person by means of a deadly weapon, a dangerous instrument or an electronic defense weapon."

[20] That request to charge was for an instruction under the subsection requiring that "the actor *recklessly* causes serious physical injury to another person by means of a deadly weapon or a dangerous instrument"; (emphasis added) General Statutes § 53a-60 (a) (3); whereas the state seeks to modify the judgment to reflect a conviction under the subsection requiring that, "with intent to cause physical injury to another person, the actor causes such injury to such person or to a third person by means of a deadly weapon or a dangerous instrument other than by means of the discharge of a firearm . . . ." General Statutes § 53a-60 (a) (2). The former is a class C felony because it requires serious physical injury, whereas the latter is a class D felony. See General Statutes § 53a-60 (b).