******************************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# STATE OF CONNECTICUT *v.* MICHAEL LEVEILLE
## (AC 47241)

Alvord, Elgo and Cradle, Js.*

*Syllabus*

Convicted, following a jury trial, of assault in the first degree, the defendant appealed. The defendant, who had a confrontation with M in a brewery and repeatedly stabbed M in the head and face with a broken beer glass, claimed, inter alia, that the evidence was insufficient to support his conviction. *Held*:

The evidence provided a sufficient basis from which the jury reasonably could have inferred that the defendant acted with the specific intent to cause M serious physical injury, as surveillance video depicted the defendant's attack on M, and the defendant testified that he knew the glass could pose a danger to M and that what he was doing could seriously injure M.

Testimony from a paramedic and a physician who treated M provided ample evidence from which the jury reasonably could have concluded that the defendant caused M serious physical injury, either in the form of serious disfigurement or a serious loss or impairment of the function of M's skin and left ear, which hung from his face as a result of the defendant's attack.

The defendant's contention that the state failed to disprove his claim of self-defense was unavailing, as none of the evidence, including surveillance video of the incident, supported his assertion that M had threatened to use physical force against the defendant, a text message the defendant sent to his date that evening after the stabbing supported the reasonable inference that the defendant did not believe he had acted in self-defense, and the jury reasonably could have concluded that the defendant's belief that he used the degree of physical force necessary to defend himself was not objectively reasonable in light of his testimony that he had no reason to believe that M possessed a weapon and that he continued attacking M with the glass even as he saw that M was not trying to defend himself.

Contrary to the defendant's contention, the trial court's jury instruction on serious physical injury was not constitutionally deficient because it included the statutory (§ 53a-3 (4)) definition of only one type of serious physical injury or because it failed to include his proposed definitions of certain terms, as the instruction was correct in law, adapted to the issues in the case and sufficient for the guidance of the jury.

The prosecutor's closing arguments to the jury were not improper and, thus, did not violate the defendant's due process right to a fair trial, as the

---

* The listing of judges reflects their seniority status on this court as of the date of oral argument.

prosecutor's contentions that the defendant intended to kill M and had testified falsely and fabricated evidence were properly rooted in the evidence and the reasonable inferences drawn therefrom.

Argued February 3—officially released May 20, 2025

*Procedural History*

Substitute information charging the defendant with the crime of assault in the first degree, brought to the Superior Court in the judicial district of New Britain and tried to the jury before *Pelosi, J.*; verdict of guilty; thereafter, the court denied the defendant's motion for a new trial and rendered judgment in accordance with the verdict, from which the defendant appealed to this court. *Affirmed.*

*Michael A. Fitzpatrick*, for the appellant (defendant).

*Danielle Koch*, assistant state's attorney, with whom, on the brief, were *Christian M. Watson*, state's attorney, *David Clifton*, senior assistant state's attorney, and *Justin Blain*, supervisory assistant state's attorney, for the appellee (state).

*Opinion*

CRADLE, J. The defendant, Michael Leveille, appeals from the judgment of conviction, rendered following a jury trial, of one count of assault in the first degree in violation of General Statutes § 53a-59 (a) (1). On appeal, the defendant claims that (1) the evidence was insufficient to support his conviction, (2) the trial court's final instruction to the jury was constitutionally deficient, and (3) prosecutorial impropriety during closing argument deprived him of his due process right to a fair trial. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. On August 16, 2019, the defendant and Katherine Woodward, a woman he had been communicating with over the dating app Tinder, met to go running together and then went for a beer at a brewery in New Britain.

Approximately one hour later, Woodward's former boy-friend, Darl Eugene Miller (victim), arrived at the brewery to confront Woodward.[1] The victim approached the table where Woodward and the defendant were sitting and engaged in an "[un]pleasant" conversation using "some expletives." At some point during the encounter, the victim said to Woodward and the defendant, "you're fucked." Although the victim was "upset" and "animated," he was not yelling and did not threaten Woodward or the defendant.

The victim eventually walked away from the table and toward the bar, at which point Woodward said to the defendant, "we should go." The defendant finished his glass of beer and followed Woodward toward the exit with the empty glass in hand. As the defendant walked by the victim, who was still standing at the bar, the victim turned and began to follow the defendant while saying "more un-nice things" to him. Before reaching the exit, the defendant turned around and struck the victim in the face with the empty beer glass, causing the glass to shatter. As the defendant continued to strike the victim's head and face with the broken beer glass, the victim tripped over nearby chairs, causing him and the defendant to fall to the ground. Once on the ground, the defendant continued to stab the victim's head and face with the remnant of the broken glass even though the victim "[was not] even try[ing] to defend himself . . . ." Several bystanders, who were concerned for the victim's safety, attempted to restrain the defendant. After a brief struggle, they managed to separate the defendant from the victim approximately twenty seconds after the attack began.

Within minutes, officers from the New Britain Police Department and Hannah Stewart, a paramedic, responded

---

[1] Woodward had told the victim that she was going for a run at an area reservoir. The victim, who believed that he and Woodward were still in a romantic relationship and suspected that Woodward was lying, drove to various bars until he found her.

to the brewery. Upon her arrival, Stewart noticed that the victim "was bleeding everywhere" and observed lacerations to his chin, forehead, and cheeks as well as "an avulsed ear," meaning that "[t]he top half [of his ear] . . . was no longer connected to his face." Stewart classified the victim as a "level 1 trauma" and transported him to Saint Francis Hospital and Medical Center in Hartford, where emergency department physicians treated him for his injuries. There was a four centimeter laceration to the victim's left ear that required fifteen sutures to close, and an eight centimeter laceration to his chin that required thirteen sutures to close.[2] The victim also required a total of six staples to close two lacerations to his scalp, each measuring three centimeters in length, which were contaminated with small particles of glass. Although emergency department physicians were able to remove most of the glass by irrigating the wounds, they were unable to remove all the glass particles from the victim's scalp before closing the lacerations.[3]

After a brief investigation, police officers arrested the defendant the following morning. The defendant subsequently was charged with one count of assault in the first degree in violation of § 53a-59 (a) (1).[4] Following a jury trial over four days in September, 2023, the

---

[2] While recovering from his injuries, the victim had to return to the hospital twice to have the laceration to his chin "reclosed" because the sutures had "bust[ed] open."

[3] The remaining particles of glass were expelled from the victim's body naturally during the healing process. Specifically, the victim was "pick[ing] out" particles of glass from his scalp "for the better part of two years" after the assault.

[4] On September 1, 2023, the state filed a long form information charging the defendant with one count of assault in the first degree in violation of § 53a-59 (a) (1), alleging that the defendant, "intending to cause serious physical injury to another person did cause such injury to such person by means of a dangerous instrument, to wit: [the defendant] intended to cause serious physical injury to [the victim] and did cause serious physical injury to [the victim] by striking and stabbing [the victim] with a beer glass."

defendant was found guilty. On December 11, 2023, the court, *Pelosi, J.,* sentenced the defendant to twenty years of incarceration, execution suspended after seven and one-half years, five years of which was a mandatory minimum, followed by five years of probation. This appeal followed. Additional facts and procedural history will be set forth as necessary.

## I

The defendant first claims that the evidence was insufficient (1) to prove that he intended to cause the victim serious physical injury, (2) to prove that he caused the victim serious physical injury, and (3) to disprove his claimed justification of self-defense.

Section 53a-59 (a) provides in relevant part: "A person is guilty of assault in the first degree when . . . (1) [w]ith intent to cause serious physical injury to another person, he causes such injury to such person . . . by means of . . . a dangerous instrument . . . ."[5] "In reviewing the sufficiency of the evidence to support a criminal conviction we apply a [two part] test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [jury] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . . In particular, before this court may overturn a jury verdict for insufficient evidence, it must conclude that no reasonable jury could arrive at the conclusion the jury did. . . . Although the jury must find every element proven beyond a reasonable doubt in order to find the defendant guilty of the charged offense . . . each of the basic and inferred facts underlying those conclusions

---

[5] The defendant does not challenge the sufficiency of the evidence as to the "dangerous instrument" element of § 53a-59 (a) (1).

need not be proved beyond a reasonable doubt." (Citation omitted; internal quotation marks omitted.) *State* v. *Charles L.*, 217 Conn. App. 380, 386, 288 A.3d 664, cert. denied, 346 Conn. 920, 291 A.3d 607 (2023). "The standard of review governing a challenge to the sufficiency of the evidence to defeat a claim of self-defense . . . is the same [as the] standard used when examining claims of insufficiency of the evidence." (Internal quotation marks omitted.) *State* v. *Johnson*, 351 Conn. 53, 62–63, 328 A.3d 143 (2025). With these principles in mind, we address each of the defendant's claims in turn.

A

The defendant first argues that there was insufficient evidence to establish that he intended to cause the victim serious physical injury. Specifically, he argues that "[t]he state presented no direct evidence" on the issue of intent and "the circumstantial evidence [presented] by the state was unconvincing." We are not persuaded.

"Assault in the first degree is a specific intent crime. . . . It requires that the criminal actor possess the specific intent to cause [serious] physical injury to another person."[6] (Internal quotation marks omitted.) *State* v. *Pagan*, 158 Conn. App. 620, 627 n.6, 119 A.3d 1259, cert. denied, 319 Conn. 909, 123 A.3d 438 (2015). "We have long recognized that direct evidence of the accused's state of mind is rarely available. . . . Therefore, intent is often inferred from conduct . . . and from the cumulative effect of the circumstantial evidence and the rational inferences drawn therefrom." (Internal quotation marks omitted.) Id., 627. "Intent may be gleaned from circumstantial evidence such as the type of

---

[6] As defined in General Statutes § 53a-3 (11), "[a] person acts 'intentionally' with respect to a result or to conduct described by a statute defining an offense when his conscious objective is to cause such result or to engage in such conduct . . . ."

weapon used, [and] the manner in which it was used . . . . Furthermore, it is a permissible, albeit not a necessary or mandatory, inference that a defendant intended the natural consequences of his voluntary conduct." (Internal quotation marks omitted.) *State* v. *Santiago*, 206 Conn. App. 390, 402–403, 260 A.3d 585, cert. denied, 339 Conn. 918, 262 A.3d 138 (2021). "Intent is a question of fact, the determination of which should stand unless the conclusion drawn by the trier is an unreasonable one." (Internal quotation marks omitted.) Id., 402.

On the basis of the evidence presented and the reasonable inferences that could be drawn therefrom, the jury reasonably could have found that the defendant intended to cause the victim serious physical injury when he struck him with a beer glass and used the broken glass to repeatedly stab the victim in the head and face. The jury was shown surveillance video of the assault captured by the security cameras at the brewery. The video shows the defendant bringing his empty beer glass with him as he gets up from his table and walks toward the exit. As the victim begins to follow him, the defendant stops, turns around to face victim, and strikes him in the face with the beer glass. The video then shows the defendant repeatedly stabbing the victim's head and face with the broken glass. The video further corroborates witness testimony that the victim, after falling to the ground, was covering his face while being repeatedly struck by the defendant. At trial, the defendant acknowledged that he knew at the time of the assault that the beer glass "could [pose] a danger" and that he was "aware that what [he was] doing [could] seriously injur[e] [the victim]." The defendant further testified that he was "aiming specifically for the top of [the victim's] head" because "[i]t's the hardest part" and "bleeds a lot." Viewed cumulatively, this evidence

provided a sufficient basis from which the jury reasonably could have inferred that the defendant acted with the specific intent to cause the victim serious physical injury.[7]

B

The defendant next claims that there was insufficient evidence to establish that he caused the victim serious physical injury. We disagree.

As defined in General Statutes § 53a-3 (4), a serious physical injury is a "physical injury[8] which creates a substantial risk of death, or which causes serious disfigurement, serious impairment of health or serious loss or impairment of the function of any bodily organ . . . ."[9] (Footnote added.) "[T]he term serious physical injury does not require that the injury be permanent [and] a victim's complete recovery is of no consequence . . . ." (Internal quotation marks omitted.) *State* v. *Morlo M.*, 206 Conn. App. 660, 671, 261 A.3d 68, cert. denied, 339 Conn. 910, 261 A.3d 745 (2021). "Whether

___

[7] In support of his claim, the defendant argues that his own testimony at trial provided "direct evidence" that he lacked the intent to seriously injure the victim. To the contrary, as noted herein, the defendant testified that he was aware that his conduct could seriously injure the victim and that he intentionally targeted the top of the victim's head because it "bleeds a lot." Moreover, it is well established that "[t]he [jury is] not bound to accept as true the defendant's claim of lack of intent or his explanation of why he lacked intent." (Internal quotation marks omitted.) *State* v. *Santiago*, supra, 206 Conn. App. 402. "[I]t is axiomatic that this court does not assess the credibility of witnesses, and we decline the defendant's invitation to do so here." (Internal quotation marks omitted.) *State* v. *Miller*, 229 Conn. App. 435, 443 n.5, 327 A.3d 448 (2024), cert. denied, 351 Conn. 909, 330 A.3d 880 (2025).

[8] As defined in General Statutes § 53a-3 (3), " '[p]hysical injury' means impairment of physical condition or pain . . . ."

[9] We note, however, that, to find the defendant guilty of assault in the first degree, "[t]he jurors had only to determine . . . whether the victim suffered a serious physical injury; they did not have to agree on which type of [serious physical] injury." *State* v. *Wynter*, 19 Conn. App. 654, 666, 564 A.2d 296, cert. denied, 213 Conn. 802, 567 A.2d 834 (1989).

an injury constitutes a serious physical injury . . . is a fact intensive inquiry and, therefore, is a question for the jury to determine. . . . [Despite] the difficulty of drawing a precise line as to where physical injury leaves off and serious physical injury begins . . . we remain mindful that [w]e do not sit as a [seventh] juror who may cast a vote against the verdict based upon our feeling that some doubt of guilt is shown by the cold printed record . . . and that we must construe the evidence in the light most favorable to sustaining the verdict." (Citation omitted; internal quotation marks omitted.) Id., 670.

Here, the victim sustained four lacerations to his head and face that required twenty-eight sutures and six staples to close. The jury heard testimony from Justus Guerrieri, the emergency department physician who treated the victim, regarding the important functions of the skin: "[Y]our skin is a barrier against infection . . . . The skin is, well, it's the largest organ in your body, and it has a few important roles, I mean . . . none of us can survive without skin. It protects us from trauma, from infection, from bacteria entering your body." The jury also heard ample witness testimony regarding how the victim's injuries seriously impaired those functions. Guerrieri explained that the victim's scalp lacerations presented a risk of infection because they were "large" wounds "contaminated" with "presumed foreign bodies." The victim testified that the particles of glass embedded in his skull from those injuries continued to emerge from his skin "for the better part of two years" after the assault. Guerrieri further testified that there was an increased risk of infection associated with the victim's chin laceration because "[i]t was a gaping, relatively large wound." Due to the location of that laceration, the wound reopened twice during the recovery process because "every time [the victim] turned or tried to eat or did anything, it

would pull the scab." In addition, Guerrieri testified that the victim's ear laceration was susceptible to infection because "[the] ear is made of cartilage, which is a slow healing tissue" and "has less blood flow and less reparative capabilities . . . than normal tissue." Moreover, Guerrieri explained to the jury that the ear itself is an organ. Stewart testified that, when she arrived at the brewery, the victim's ear was "mostly coming off . . . . Basically, his ear was hanging on by the bottom half. The top half was not connected to the rest of [his] face." She had to wrap bandages around the victim's head "[s]o his ear didn't fall off any more." Stewart's testimony was corroborated by Guerrieri, who stated that "the [victim's ear] laceration . . . did nearly lacerate through the entire structure," and, as a result, "[t]he structure . . . [of] his ear was compromised . . . ." On the basis of the foregoing testimony, we conclude that there was sufficient evidence from which the jury reasonably could have found that the defendant caused the victim physical injuries that caused the serious loss or impairment of the function of a bodily organ, specifically, his skin and ear.

In addition, much of the previously discussed testimony provided a foundation for a conclusion that the same injuries also caused serious disfigurement. " 'Serious disfigurement' is an impairment of or injury to the beauty, symmetry or appearance of a person of a magnitude that substantially detracts from the person's appearance from the perspective of an objective observer. In assessing whether an impairment or injury constitutes serious disfigurement, factors that may be considered include the duration of the disfigurement, as well as its location, size, and overall appearance. Serious disfigurement does not necessarily have to be permanent or in a location that is readily visible to others. The jury is not bound by any strict formula in weighing these factors, as a highly prominent scar in a less visible

location may constitute serious disfigurement, just as a less prominent scar in a more visible location, especially one's face, may constitute serious disfigurement." (Footnote omitted.) *State* v. *Petion*, 332 Conn. 472, 491–92, 211 A.3d 991 (2019); see also id., 480, 494–95 (one and one-half inch scar on victim's forearm that was "not . . . in a prominent location" and "otherwise unremarkable in its general appearance" did not constitute serious disfigurement); *State* v. *Morlo M.*, supra, 206 Conn. App. 672 (visible bruising on victim's body and "noticeable injuries" to head and face constituted serious disfigurement); *State* v. *Lewis*, 146 Conn. App. 589, 607–608, 79 A.3d 102 (2013) (forehead laceration, facial fractures, and chipped teeth constituted serious disfigurement), cert. denied, 311 Conn. 904, 83 A.3d 605 (2014); *State* v. *Nelson*, 118 Conn. App. 831, 850, 986 A.2d 311 (scarring on victim's face and abdomen constituted serious disfigurement), cert. denied, 295 Conn. 911, 989 A.2d 1074 (2010); *State* v. *Hayward*, 116 Conn. App. 511, 516, 976 A.2d 791 (scarring on victim's nose constituted serious disfigurement), cert. denied, 293 Conn. 934, 981 A.2d 1077 (2009).

Here, Guerrieri testified that there was a "reasonable degree of medical certainty" that scarring would result from the victim's chin, ear, and scalp lacerations, noting that the ear laceration in particular posed "an increased risk of scarring" because "any cartilage structure heals so slowly . . . ." The victim's testimony confirmed that his injuries resulted in scarring on his jaw, his ear, and the top of his head. In addition, Guerrieri testified that, when the victim arrived at the emergency department, his ear "was deformed from the laceration," and the victim confirmed at trial that the injury resulted in a "permanent deformity" to his ear. Specifically, the victim testified: "There's a notch missing and the ear loop is funny, and . . . [t]he center part of my ear has a knot on it and a gash." At trial, the victim stepped down

from the witness stand and showed the jury the "piece missing" from his ear. Under the factors set forth in *Petion*, we cannot conclude that there was insufficient evidence from which the jury could find that the victim's cumulative injuries caused serious disfigurement.[10]

Accordingly, we conclude, on the basis of the cumulative effect of the evidence, that the state produced ample evidence from which the jury reasonably could have concluded that the defendant caused the victim serious physical injury, either in the form of serious disfigurement or serious loss or impairment of the function of any bodily organ.

## C

The defendant further argues that the state presented insufficient evidence to disprove his claim of self-defense as a justification for his use of physical force, as

---

[10] The defendant's arguments to the contrary are not convincing. Specifically, he argues that, because the victim "never described the scars or exposed them from under his hair and beard, the jury had no evidence of their characteristics . . . which the jury would need before it could find that the disfigurements, assuming their existence, were 'serious.' " He further argues that the victim's ear deformity did not constitute serious disfigurement because it is "so inconsequential that no objective observer could reasonably conclude that it altered, let alone substantially detracted from, [the victim's] appearance."

We reiterate, however, that our Supreme Court in *Petion* held that "[s]erious disfigurement does not necessarily have to be . . . in a location that is readily visible to others." *State* v. *Petion*, supra, 332 Conn. 491. Here, the victim testified that he had scarring on his scalp, jaw, and ear. He further testified that his scalp scars would be visible if he were to shave his head, and the record indicates that the victim *did* show the jury the scarring on his ear. Moreover, the defendant's arguments address only whether the victim's injuries at the time of trial were sufficient to support the jury's finding of serious physical injury. "[I]n assessing the seriousness of the disfigurement, the jury was not limited to considering the injury in its final, fully healed state." Id., 497. During the defendant's trial, which took place four years after the date of the assault, the jury was shown three photographs of the victim's injuries as they appeared immediately after the assault. Those photographs, along with the ample witness testimony describing the victim's injuries prior to their fully healed state, provided a sufficient basis from which the jury reasonably could have found that the victim's injuries caused serious disfigurement.

set forth in General Statutes § 53a-19 (a).[11] We disagree.

Section 53a-19 (a) provides in relevant part that "a person is justified in using reasonable physical force upon another person to defend himself . . . from what he reasonably believes to be the use or imminent use of physical force, and he may use such degree of force which he reasonably believes to be necessary for such purpose; except that deadly physical force may not be used unless the actor reasonably believes that such other person is (1) using or about to use deadly physical force, or (2) inflicting or about to inflict great bodily harm."[12] "[T]he test a jury must apply . . . is a subjective-objective one. The jury must view the situation from the perspective of the defendant . . . [but] . . . the defendant's belief ultimately must be found to be reasonable." (Internal quotation marks omitted.) *State* v. *Hughes*, 341 Conn. 387, 398–99, 267 A.3d 81 (2021).

"Self-defense is a defense, but not an affirmative defense, which means that the defendant only has a burden of production and does not have a burden of persuasion; once the defendant introduces sufficient evidence to warrant presenting his claim of self-defense to the jury, it is the state's burden to disprove the defense beyond a reasonable doubt." *State* v. *Magaraci*, 198 Conn. App. 305, 312, 232 A.3d 1220 (2020), cert. denied, 345 Conn. 916, 284 A.3d 299 (2022). "Whether

___

[11] In its final instructions to the jury, the court, pursuant to defense counsel's request and over the state's objection, set forth the elements of self-defense and instructed the jury that, if it were to find the defendant guilty of the charged offense, it must consider whether he acted in self-defense.

[12] There are additional statutory exceptions to self-defense, only one of which—the duty to retreat—was relevant to the defendant's claimed defense. Pursuant to § 53a-19 (b), "a person is not justified in using deadly physical force upon another person if he or she knows that he or she can avoid the necessity of using such force with complete safety . . . (1) by retreating . . . ." In the present case, the court instructed the jury that it must consider the duty to retreat exception if it were to find that the defendant had used deadly physical force against the victim.

the defense of the justified use of force, properly raised at trial, has been disproved by the state is a question of fact for the jury, to be determined from all the evidence in the case and the reasonable inferences drawn from that evidence. . . . As long as the evidence presented at trial was sufficient to allow the jury reasonably to conclude that the state had met its burden of persuasion, the verdict will be sustained." (Internal quotation marks omitted.) *State* v. *Brown*, 198 Conn. App. 630, 636, 233 A.3d 1258, cert. denied, 335 Conn. 942, 237 A.3d 730 (2020).

On appeal, the defendant claims, inter alia, that the state failed to disprove that (1) he was defending himself from what he reasonably believed to be the victim's imminent use of physical force, and (2) he used the degree of physical force he reasonably believed to be necessary to defend himself from the victim.] In support of the former claim, the defendant relies on his own testimony in arguing that, at the time he struck the victim, "[h]e believed [the victim] was about to punch him" because the victim "drew his hand back, as if he was about to curl a fist." The defendant suggests that, because his testimony provided direct evidence of his belief at the time that he attacked the victim, and the state "offered no evidence that the defendant's belief was something different," the state failed to disprove his claim of self-defense. We are not persuaded.[13]

None of the evidence at trial supports the defendant's argument that the victim threatened the use of physical

---

[13] We emphasize that "[i]t is the exclusive province of the trier of fact to weigh conflicting testimony and make determinations of credibility, crediting some, all or none of any given witness' testimony." (Internal quotation marks omitted.) *State* v. *DeMarco*, 311 Conn. 510, 519–20, 88 A.3d 491 (2014). Thus, although the defendant testified as to his beliefs at the time of the assault, the jury was not required to believe his testimony. Moreover, the state presented ample evidence, as set forth herein, contradicting the defendant's version of the events. "[T]he [jury] [was] free to juxtapose conflicting versions of events and determine which is more credible." (Internal quotation marks omitted.) *State* v. *Brown*, supra, 198 Conn. App. 637.

force against the defendant. Indeed, the surveillance video, which does not show the victim drawing his hand back or curling it into a fist before the defendant struck him, plainly contradicted the defendant's version of the events. The jury also could have given weight to the fact that the defendant's written statement to the police on the night of the assault did not specifically mention that he saw the victim draw his hand back or curl it into a fist. In addition, the state challenged the credibility of the defendant's testimony through the admission of a text message he had sent to Woodward shortly after the assault that stated, "it'll help my case if [the victim] was stalking you." The defendant's message, viewed in the light most favorable to sustaining the verdict, supports a reasonable inference that he did not believe his attack on the victim was merely an act of self-defense. Accordingly, we conclude that there was a rational view of the evidence from which the jury could conclude, beyond a reasonable doubt that, at the time of the assault, the defendant did not reasonably believe that the victim was about to use physical force against him.

Even if the jury had credited the defendant's testimony that he reasonably believed that the victim was about to assault him, the jury reasonably could have concluded that the defendant's belief that he used the degree of physical force necessary to defend himself was not an objectively reasonable one. Although the defendant testified at trial that he had no reason to believe that the victim possessed any type of weapon, he nonetheless chose to attack the victim with a beer glass despite his awareness of the "weapon's danger" and its capability of "seriously injur[ing]" the victim. The defendant further acknowledged that, after the glass shattered, he continued attacking the victim with the broken glass even as he saw that the victim, who

was bleeding profusely, was not trying to defend himself. The video of the assault, which does not show the victim attempting to hit or strike the defendant at any point, shows the defendant stabbing, or attempting to stab, the victim approximately seventeen times. Finally, the bystanders who intervened testified that, when they tried to restrain the defendant, he shouted, "let me go," while attempting to overpower them and continue his assault of the victim, which ceased only when one of the bystanders managed to get the defendant into a "choke hold . . . ."

On the basis of the foregoing, we conclude that the defendant's challenge to the sufficiency of the evidence to defeat his self-defense claim is unavailing.[14]

## II

The defendant next claims that the trial court's instruction to the jury on serious physical injury was constitutionally deficient in that it failed to adequately guide the jury in determining whether the state proved that the defendant had caused the victim serious physical injury. Specifically, the defendant claims that the inadequate instruction "deprived [him] of his federal and state constitutional rights to due process of law and to present a defense."

The following facts and procedural history are relevant to the defendant's claim. On September 6, 2023, defense counsel filed a written request to charge that included, inter alia, an instruction on serious physical

---

[14] In light of our conclusion that the state presented sufficient evidence to disprove the defendant's claim of self-defense pursuant to § 53a-19 (a), we need not consider the defendant's alternative claim that, had the jury found his beliefs to be reasonable, the state failed to prove that the defendant had used deadly physical force and that such force was unjustified pursuant to the duty to retreat exception to self-defense discussed in footnote 12 of this opinion. See *State* v. *Hughes*, supra, 341 Conn. 394–95.

injury.[15] The court denied counsel's request and indicated that it instead would provide an instruction on serious physical injury based on the Judicial Branch's model criminal jury instructions.[16] Thereafter, on September 18, 2023, the court instructed the jury on serious physical injury as follows: "Serious physical injury is something more serious than mere physical injury, which is defined as impairment of physical condition or pain; it is more than a minor or superficial injury. It is defined by statute as physical injury which creates a substantial risk of death, or which causes serious disfigurement, serious impairment of health, or serious loss or impairment of the function of any bodily organ." The court's instruction on serious physical injury fol-

___

[15] In his request to charge, defense counsel requested the following instruction on serious physical injury: "The word 'serious' means 'grave and not trivial in quality or manner.' Thus, to be 'serious,' the loss or injury at issue must be substantially greater than the minimum required to establish a loss or injury. For 'serious disfigurement,' that means disfigurement 'that would make the injured party's appearance distressing or objectionable to a reasonable person observing him.' For 'serious impairment of health or loss or impairment of the function of a bodily organ,' you must find that the injured party suffered injury or impairment of a significant degree which greatly hindered the injured party. Factors that can be considered in deciding whether [the] injury is 'serious' include: the size, severity and extent of the impairment or disfigurement, the location of the injury or disfigurement, the parts of the body affected by the impairment or disfigurement, the length of time the impairment or disfigurement lasted, the treatment required to correct the impairment or disfigurement, and any other relevant factors. An impairment or disfigurement need not be permanent to be serious; likewise, a permanent impairment or disfigurement does not necessitate a finding of serious injury."

[16] The record indicates that, on September 15, 2023, the court conducted a charge conference with counsel off the record and, thereafter, provided counsel with a final draft of its proposed charge. On September 18, 2023, prior to the court's final instructions, defense counsel "note[d] . . . for the record" his exception to the court's final draft, "to the extent [that] any of [his] request[ed] [instructions] were not adopted." The court noted his objection and responded in relevant part: "I looked at the glossary of terms in our Connecticut jury instructions and included that language. And I included the language that is included in serious physical injury . . . according to the language in our criminal jury instructions, and I just left it as is."

lowed verbatim the relevant portion of the model jury instruction on assault in the first degree. See Connecticut Criminal Jury Instructions 6.1-1, available at https://jud.ct.gov/JI/Criminal/ Criminal.pdf (last visited May 14, 2025).[17] In addition, the court gave a further instruction on serious disfigurement that was a verbatim iteration of the definition our Supreme Court set forth in *State* v. *Petion*, supra, 332 Conn. 491–92.[18]

Although the defendant concedes that the trial court's instruction on serious physical injury was consistent with the model jury instructions, the relevant statutory definitions, and the instruction on serious disfigurement set forth in *Petion*, he claims that it was constitutionally deficient because the court's instruction failed to include his "proposed definitions for impairment of health and impairment of organ function, as well as [his proposed] definition for the term 'serious,' " which he argues were necessary to "adequately guide the jury

[17] Instruction 6.1-1 of the Connecticut model criminal jury instructions provides in relevant part: " 'Serious physical injury' is something more serious than mere physical injury, which is defined as 'impairment of physical condition or pain.' It is more than a minor or superficial injury. It is defined by statute as 'physical injury which creates a substantial risk of death, or which causes serious disfigurement, serious impairment of health or serious loss or impairment of the function of any bodily organ' . . ."

[18] The court instructed the jury: "[D]isfigurement means impairment of or injury to the beauty, symmetry, or appearance of a person that renders the person unsightly, misshapen or imperfect, or deformed . . . in some manner, or otherwise causes a detrimental change in the external form of the person. Serious disfigurement is an impairment of or injury to the beauty, symmetry, or appearance of a person of magnitude that substantially distracts from the person's appearance from the perspective of an objective observer. In assessing whether an impairment or injury constitutes serious disfigurement, factors that may be considered include the duration of the disfigurement, as well as its location, size, and overall appearance. Serious disfigurement does not necessarily have to be permanent or in a location that is readily visible to others. The jury is not bound by any strict formula in weighing these factors, [as a] highly prominent scar in a less visible location may constitute . . . serious disfigurement, just as a less prominent scar in a more visible location, especially one's face, may constitute serious disfigurement."

in determining whether a serious physical injury was proven . . . ." We are not persuaded.

"[I]n reviewing a constitutional challenge to the trial court's instruction, we must consider the jury charge as a whole to determine whether it is reasonably possible that the instruction misled the jury. . . . We will reverse a conviction only if, in the context of the whole, there is a reasonable possibility that the jury was misled in reaching its verdict."[19] (Citation omitted; internal quotation marks omitted.) *State* v. *Griggs*, 288 Conn. 116, 125, 951 A.2d 531 (2008). "A jury instruction is constitutionally adequate if it provides the jurors with a clear understanding of the elements of the crime charged, and affords them proper guidance for their determination of whether those elements were present. . . . The test of a charge is whether it is correct in law, adapted to the issues and sufficient for the guidance of the jury." (Internal quotation marks omitted.) Id.

"Although [a] request to charge which is relevant to the issues of [a] case and which is an accurate statement of the law must be given . . . [a] refusal to charge in the exact words of a request . . . will not constitute error if the requested charge is given in substance." (Internal quotation marks omitted.) *State* v. *Ledbetter*, 263 Conn. 1, 22, 818 A.2d 1 (2003). "The trial court is not under a duty in a criminal proceeding to charge in the identical language requested if the charge [given to the jury] is accurate, adequate and, in substance, properly includes material portions of the defendant's request; its responsibility is performed when it gives

---

[19] Conversely, "[i]n appeals not involving a constitutional question [we] must determine whether it is reasonably *probable* that the jury [was] misled . . . ." (Emphasis added; internal quotation marks omitted.) *State* v. *Ortiz*, 343 Conn. 566, 594, 275 A.3d 578 (2022). We assume, without deciding, that the defendant's alleged instructional error is of constitutional proportion, and we conclude for the reasons set forth herein that the court's instruction was not inadequate.

instructions to the jury in a manner calculated to give them a clear understanding of the issues presented for their consideration, under the offenses charged and upon the evidence, and when its instructions are suited to their guidance in the determination of those issues." (Internal quotation marks omitted.) *State* v. *Moye*, 119 Conn. App. 143, 154–55, 986 A.2d 1134, cert. denied, 297 Conn. 907, 995 A.2d 638 (2010).

Here, the defendant does not contend that the instruction the trial court gave was an incorrect statement of law, and he concedes that the court's instruction on serious physical injury followed verbatim the model instruction, which incorporates the definition of serious physical injury set forth in § 53a-3 (4), which, in turn, lists several types of physical injury that constitute serious physical injury.[20] See *State* v. *Daniel B.*, 164 Conn. App. 318, 349, 137 A.3d 837 (2016) ("[w]hile not dispositive of the adequacy of the [jury] instruction, an instruction's uniformity with the model instructions is a relevant and persuasive factor in our analysis" (internal quotation marks omitted)), aff'd, 331 Conn. 1, 201 A.3d 989 (2019). Although the court's instruction included a definition for only one type of serious physical injury set forth in § 53a-3 (4) (i.e., serious disfigurement), "[j]ury instructions need not be exhaustive, perfect or technically accurate, so long as they are correct in law, adapted to the issues and sufficient for the guidance of the jury." (Internal quotation marks omitted.) *Sanchez* v. *Hartford*, 227 Conn. App. 771, 779, 322 A.3d 1108, cert. denied, 350 Conn. 922, 325 A.3d 1093 (2024). The defendant cites no authority, nor did our research disclose any, that supports his claim that a jury instruction is constitutionally deficient in the absence of such definitions, particularly where, as here, the court's charge incorporated the controlling statutory language and case law and, furthermore, tracked the language

[20] See part I B of this opinion.

of the model jury instruction.[21] Accordingly, we conclude that the instruction the court gave was correct in law and sufficient for the guidance of the jury, and, therefore, the defendant's claim fails.[22]

### III

Finally, the defendant claims that prosecutorial improprieties during closing argument deprived him of

---

[21] Moreover, defense counsel's requested instruction and the proposed definitions therein have no basis in the statutes or case law of our state. See footnote 15 of this opinion. The defendant asserts that the requested instruction on the modifier "serious" is "derived from *Petion* and [our] Supreme Court's review of sister state definitions of 'serious impairment . . . .' " Specifically, the requested instruction incorporates language from a Rhode Island decision and a New York decision that were among the many decisions from other states' courts that our Supreme Court in *Petion* looked to for guidance when formulating its own definition of serious disfigurement so as to distinguish it from mere disfigurement. See *State* v. *Petion*, supra, 332 Conn. 482–87. Significantly, however, although the court in *Petion* considered the New York and Rhode Island decisions quoted in defense counsel's requested instruction in the present case, the court in *Petion* ultimately declined to adopt the language of those decisions in its own definition. See id., 491–92.

Additionally, although the defendant asserts that his proposed definitions for " 'serious impairment of health' " and " 'serious loss or impairment of the function of any bodily organ' " are "logical extension[s] of *Petion*'s principles," the court in *Petion* expressly stated that it was "not attempt[ing] . . . to draw comprehensive distinctions for general application." *State* v. *Petion*, supra, 332 Conn. 482. Rather, "[its] focus [was] on one type of serious physical injury—serious disfigurement." Id. Moreover, the defendant's proposed definition, that such loss or impairment must be " 'of a significant degree which greatly hindered the injured party,' " uses language that does not appear anywhere in the *Petion* decision.

Finally, the defendant acknowledges that the remaining portions of his requested charge are "taken in part from *DiFranco* v. *Pickard*, [427 Mich. 32, 38–40, 398 N.W. 2d 896 (1986)], and *Washington* v. *Baxter*, [553 Pa. 434, 447–48, 719 A.2d 733 (1998)] . . . ."

[22] We additionally note that, even if we assume that the trial court's instruction failed to adequately guide the jury in determining whether the victim had sustained injuries that caused serious impairment of his health or a serious loss or impairment of the function of any bodily organ, the defendant would not be entitled to a reversal of his conviction. Although the defendant challenges the lack of definitions in the court's instruction as to those types of serious physical injury, he concedes that the instruction included a verbatim iteration of the definition of serious disfigurement set forth in *Petion*. See footnote 18 of this opinion. As we concluded in part I B of this opinion, there was sufficient evidence to support a finding of serious

his due process right to a fair trial. Specifically, he claims that the prosecutor improperly argued in summation that the defendant (1) intended to kill the victim because his "hookup" with Woodward was ruined, and (2) deliberately testified falsely and fabricated evidence.[23]

"In analyzing claims of prosecutorial impropriety, we engage in a two step analytical process. . . . We first examine whether prosecutorial impropriety occurred. . . . Second, if an impropriety exists, we then examine whether it deprived the defendant of his due process right to a fair trial." (Internal quotation marks omitted.) *State* v. *Albino*, 312 Conn. 763, 771, 97 A.3d 478 (2014). In addition, where the alleged improprieties occurred during closing argument, we look to the following legal principles. "It is well established that prosecutorial [impropriety] of a constitutional magnitude can occur in the course of closing arguments. . . . When making closing arguments to the jury, [however, counsel] must be allowed a generous latitude in argument, as the limits of legitimate argument and fair comment cannot be

disfigurement. Accordingly, even if we had found the defendant's arguments to be meritorious, we would have no basis to conclude that the alleged inadequacy of the court's instruction affected the jury's verdict.

[23] Following closing arguments, defense counsel took exception to the prosecutor's repeated "reference[s] to killing someone . . . ." In response, the court stated that it would "reiterate [to the jury] . . . that what either [lawyer] . . . said . . . during closing argument about the facts is not testimony or evidence. The lawyers are not witnesses. . . . It is not proper for the attorneys to express their opinions on the ultimate issues in the case, or to appeal to your emotions." Defense counsel indicated that he had no exceptions to the court's instruction.

Thereafter, following the jury's verdict and before the imposition of sentence, defense counsel filed a motion for a new trial, arguing, inter alia, that the prosecutor had engaged in impropriety during closing argument by "repeatedly suggesting that the defendant was trying to 'kill' [the victim]" and by "making repeated comments that suggested that the prosecutor knew that the defendant was lying or fabricating claims . . . ." The court subsequently denied defense counsel's motion, finding, inter alia, that the prosecutor's arguments were not improper.

determined precisely by rule and line, and something must be allowed for the zeal of counsel in the heat of argument. . . . Thus, as the state's advocate, a prosecutor may argue the state's case forcefully, [provided the argument is] fair and based [on] the facts in evidence and the reasonable inferences to be drawn therefrom." (Internal quotation marks omitted.) *State* v. *Courtney G.*, 339 Conn. 328, 341, 260 A.3d 1152 (2021). With these principles in mind, we address each of the defendant's claims in turn.

## A

The defendant first claims that the prosecutor improperly argued throughout his closing and rebuttal arguments that the defendant was trying to kill the victim and that he was motivated by the fact that his "hookup" with Woodward was ruined.[24] The defendant asserts that these arguments were improper because they had no basis in the evidence.[25] Conversely, the

[24] During closing argument, the prosecutor played for the jury the video of the assault and argued that it "shows you [the defendant's] intent. He wants to kill [the victim] or cause serious physical injury to him. He could back off at any point. . . . But remember, he's on this date. He was hoping to hook up with . . . Woodward, that's been broken up. . . . He's upset and he wants to take out his frustration on [the victim]." With respect to the defendant's claim of self-defense, the prosecutor argued: "[Y]ou know from your common sense and life experience, when you crack somebody in the head with . . . that beer glass and you stab him all those times; that's deadly force. . . . That many stabbings to that area of the face, trying to kill him, trying to seriously injure him, can reasonably expect it to do so. . . . [The defendant testified that he] attacked like this because [he] was being . . . repeatedly threatened by somebody who was bigger than [he was]. Threatened by someone bigger than you equals I can kill you. Does that offend your common sense?" The prosecutor further suggested that "[t]his was not defensive force" but, rather, "[the] defendant wanted to attack because he was frustrated his date got broken up." During his rebuttal argument, the prosecutor stated with respect to the defendant's self-defense claim: "You can't just kill someone because you have some adrenaline going through you. . . . [The defendant] doesn't get to make the decision to kill someone rather than run away."

[25] The defendant also argues that the purpose of the prosecutor's arguments "was to inflame the passions of the jur[ors]" because the defendant "was not charged with an offense that required an intent to cause death

state asserts that the prosecutor's arguments were supported by the evidence and the reasonable inferences drawn therefrom. We agree with the state.

Although a prosecutor "may not invite sheer speculation unconnected to evidence," he "may invite the jury to draw reasonable inferences from the evidence . . . ." (Internal quotation marks omitted.) *State* v. *Billings*, 217 Conn. App. 1, 50, 287 A.3d 146 (2022), cert. denied, 346 Conn. 907, 288 A.3d 217 (2023). Here, the prosecutor's argument that the defendant was trying to kill the victim was based on a reasonable inference the jury could have drawn from the evidence adduced at trial, namely, the surveillance video and the witness testimony describing the attack, as well as the weapon and the manner in which it was used. The prosecutor's argument concerning motive was also based on a reasonable inference the jury could have drawn from the evidence presented at trial. It was uncontested that the defendant and Woodward had met on Tinder, and the defendant acknowledged during cross-examination that he had used "sexual innuendos" in his messages to Woodward. During closing argument, the prosecutor specifically pointed to this evidence by inviting the jury to infer that the defendant was motivated to attack the victim because his "hookup" was ruined: "[The defendant] won't even admit [that Tinder is] a hookup app. You know that from your life experience and your common sense. . . . [Y]ou can look at [the messages in

_____

. . . ." We are not persuaded. Under § 53a-59 (a), the state was required to prove that the defendant intended to cause the victim serious physical injury, a term that encompasses "physical injury which creates a substantial risk of death . . . ." General Statutes § 53a-3 (4). In addition, the state was required to disprove the defendant's claim of self-defense, and, whether the defendant used deadly physical force or had a duty to retreat was at issue. See footnote 12 of this opinion. In context, it is clear that the prosecutor's arguments with respect to the defendant's intent to kill were directly related to satisfying the state's evidentiary burden rather than an attempt to improperly inflame the passions of the jurors. See footnote 24 of this opinion.

evidence] and make a determination for yourself based on those texts . . . . He's asking her to go to a restaurant. He's complimenting her appearance. He's having these sexual innuendos. . . . [H]e was trying to have sexual relations with . . . Woodward. That's why he was at that bar that night."

Accordingly, we conclude that the prosecutor's arguments concerning the defendant's intent to kill and his motive for the attack were properly rooted in the evidence presented at trial.

B

The defendant next claims that the prosecutor improperly expressed his opinion as to the credibility of the defendant by arguing that the defendant had "deliberately testified falsely" and was attempting to "fabricate evidence . . . ." We are not persuaded.

"[A] prosecutor may not express his [or her] own opinion, directly or indirectly, as to the credibility of the witnesses. . . . Such expressions of personal opinion are a form of unsworn and unchecked testimony, and are particularly difficult for the jury to ignore because of the prosecutor's special position. . . . Put another way, the prosecutor's opinion carries with it the imprimatur of the [state] and may induce the jury to trust the [state's] judgment rather than its own view of the evidence. . . . Moreover, because the jury is aware that the prosecutor has prepared and presented the case and consequently, may have access to matters not in evidence . . . it is likely to infer that such matters precipitated the personal opinions. . . . However, [i]t is not improper for the prosecutor to comment upon the evidence presented at trial and to argue the inferences that the jurors might draw therefrom . . . . We must give the jur[ors] the credit of being able to differentiate between argument on the evidence and attempts to persuade them to draw inferences in the state's favor,

on one hand, and improper unsworn testimony, with the suggestion of secret knowledge, on the other hand. The state's attorney should not be put in the rhetorical straitjacket of always using the passive voice, or continually emphasizing that he [or she] is simply saying I submit to you that this is what the evidence shows, or the like." (Citation omitted; internal quotation marks omitted.) *State* v. *Stevenson*, 269 Conn. 563, 583–84, 849 A.2d 626 (2004).

We reiterate that "a prosecutor may argue about the credibility of witnesses, as long as [his] assertions are based on evidence presented at trial and reasonable inferences that jurors might draw therefrom. . . . The prosecutor may also make these arguments with respect to the credibility of statements by the defendant himself, so long as they are rooted in the evidence at trial." (Internal quotation marks omitted.) *Donald G.* v. *Commissioner of Correction*, 224 Conn. App. 93, 123, 311 A.3d 187, cert. denied, 349 Conn. 902, 312 A.3d 585 (2024).

During closing argument, the prosecutor called the jury's attention to several portions of the defendant's testimony, highlighted the evidence presented at trial that contradicted his testimony, and argued that the defendant deliberately had testified falsely or was attempting to fabricate evidence.[26] Thus, the arguments

---

[26] The prosecutor argued that the defendant deliberately testified falsely when he (1) refused to admit that Tinder is a "hookup app" or that he was on a date with Woodward; (2) claimed that he initially continued to attack the victim after the bystanders intervened because he was unsure of whether the bystanders were friends of the victim; and (3) claimed that he knew that the victim was Woodward's former boyfriend prior to the attack. The prosecutor further argued that the defendant was attempting "to fabricate evidence, essentially," and "trying to build up this false fear" when he texted Woodward after the incident, "it'll help my case if [the victim] was stalking you" and when the defendant testified that he was concerned that the victim might have had a gun or another weapon.

In addition, the prosecutor concluded his initial argument by stating: "Don't listen to the defendant's lies. Hold him accountable for what he did. I submit to you that the defendant did not believe that he needed to use

made by the prosecutor were rooted in the evidence that was presented to the jury. In addition, the prosecutor prefaced those arguments by informing jurors that the court would provide them with an instruction on credibility and that it was their duty to determine whether the defendant had deliberately testified falsely.[27] Accordingly, it is clear from the context in which the statements were made that the prosecutor did not improperly express his personal opinion or beliefs as to the defendant's credibility but, rather, simply commented on the evidence and invited the jury to draw a reasonable inference that the defendant had deliberately testified falsely or was attempting to fabricate evidence with respect to those portions of his testimony.[28] See *State* v. *Barry A.*, 145 Conn. App. 582, 600, 76 A.3d 211, cert. denied, 310 Conn. 936, 79 A.3d 889 (2013). For the reasons stated, we conclude that the prosecutor did not engage in prosecutorial impropriety during closing argument

deadly physical force to repel some perceived assault from [the victim], and no reasonable person in his position would believe it. He's fabricating evidence. He's making up these claims to try to make you think he was more fearful than he actually was."

[27] Specifically, the prosecutor stated: "[W]e're going to start talking about the defendant's credibility. . . . [The court] is going to give you an instruction on credibility. And . . . one of the things I expect that [the court is] going to say [in its final instructions] is that, if you believe that a witness has deliberately testified falsely, you should seriously consider whether to believe any of that witness' testimony."

We additionally note that the prosecutor, at the outset of his closing argument, explained to the jury: "If there's anything that I say about the evidence, the testimony, that differs from your memory, it is your memory that controls. . . . [I]f you hear me arguing . . . inferences to be drawn from facts, just add that little precursor . . . the state submits the evidence shows . . . . I don't intend to give you my opinion on anything. If you hear me say anything which you believe is me giving my personal opinion, please disregard that; that is not my intention."

[28] With respect to the defendant's testimony that he was not on a date with Woodward, for example, the prosecutor argued: "[The defendant] wouldn't even admit this was a date . . . . Well . . . you've got [exhibits of the Tinder messages between the defendant and Woodward], and you can look at them and make a determination for yourself based on those texts. Was he telling the truth on the stand when he said this wasn't a date?"

and, therefore, the defendant was not deprived of his right to a fair trial.

The judgment is affirmed.

In this opinion the other judges concurred.

———————————